# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1036
_____

United States of America

*Plaintiff - Appellee*

v.

James Clay Waller

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau
_____

Submitted: June 15, 2012
Filed: August 24, 2012
[Published]
_____

Before SMITH, BEAM, and SHEPHERD, Circuit Judges.
_____

PER CURIAM.

James Clay Waller pleaded guilty to one count of knowingly transmitting in interstate commerce, via the Internet, a communication containing a threat to injure

the person of another, in violation of 18 U.S.C. § 875(c). The district court[1] sentenced Waller to 60 months' imprisonment, applying a vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1) and varying upwards under 18 U.S.C. § 3533(a) after considering Waller's culpability in the alleged murder[2] of his wife. On appeal, Waller challenges his sentence. For the reasons that follow, we affirm.

## I. *Background*

On July 26, 2011, Cheryl Brenneke contacted the Cape Girardeau County, Missouri Sheriff's Department concerning a threat to kill her. The threat appeared as a post on a website dedicated to following developments in the June 1, 2011 disappearance of her younger sister and Waller's estranged wife, Jacque Waller ("Jacque"). The threat was found under a discussion entitled, "Police Search for Missing Jackson Woman," post number "4164." The post stated: "You are dead I promise If those kids get hurt, your fault, accident, nobodys fault. Your dad threaten clay, I know he's all talk, I will get you 5, 10, 25 years from now. You have it coming." The threat made Brenneke fear for her life and caused her to take precautions to protect herself, her family, and Jacque's three children.[3] Brenneke believed at the time that Waller had murdered her sister and was now threatening to kill her.

---

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

[2]We take judicial notice of the fact that following sentencing in this case, Missouri charged Waller with the murder of his wife Jacque. *See* Crimesider Staff, *Jacque Waller Case: Hearing set for Clay Waller in missing wife's death*, CBS News (July 23, 2012, 5:03 PM), http://www.cbsnews.com/2102-504083_162-574 78181.html?tag=contentMain;contentBody.

[3]The Missouri Children's Division temporarily placed the Wallers' five-year-old triplets in Brenneke's custody following Jacque's disappearance.

Federal authorities learned that the threat originated from a computer located at Plaza Pawn, a pawn shop, in Cape Girardeau, Missouri. Authorities executed a federal search warrant and seized the computer. Surveillance cameras in Plaza Pawn verified that Waller was the sole operator of the computer at the time that the threat was posted.

An indictment charged Waller with knowingly transmitting in interstate commerce, via the Internet, a communication containing a threat to injure the person of another, in violation of 18 U.S.C. § 875(c). Waller pleaded guilty to the one-count indictment, and a presentence report (PSR) followed.

The PSR recommended a base-offense level of 12 and a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, resulting in a total offense level of ten. With a criminal history category of I, the PSR calculated a Guidelines-range sentence for Waller of 6 to 12 months' imprisonment. The government objected to the PSR. First, the government argued that two levels should be added to Waller's base-offense level under U.S.S.G. § 3A1.1(b)(1) because Waller knew or should have known that the victim of the offense was a vulnerable victim. Second, the government sought upward departures under U.S.S.G. § 4A1.3(a) and § 5K2.0 because (a) Waller's "criminal[-]history category substantially underrepresent[ed] the seriousness of [his] criminal history or the likelihood that [he would] commit other crimes," and (b) "there exist[ed] aggravating circumstances, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines, that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." Finally, the government argued that, under the factors specified in § 3553(e), an upward variance was also justified.

At sentencing, the government offered Exhibit A, a 23-page sworn affidavit of FBI Special Agent Brian W. Ritter. Special Agent Ritter investigated Waller's threat

to Brenneke and also served as a lead investigator into the June 1, 2011 disappearance of Jacque. The affidavit detailed evidence collected in the instant offense, evidence collected in Jacque's disappearance, and evidence of Waller's prior misdeeds. Twenty-four exhibits accompanied Special Agent Ritter's affidavit, which included sworn statements to law enforcement authorities, official police reports, and official court documents supporting the content of Special Agent Ritter's affidavit. The government provided the affidavit and exhibits to Waller's counsel in advance of the sentencing hearing. Waller did not object to the government's introduction, and the court's consideration, of the affidavit or the exhibits.

The government called Brenneke to testify. Brenneke testified that the state court had placed Jacque's and Waller's three minor children into her and her husband's care. The state court had denied Waller visitation with the children. According to Brenneke, Jacque married Waller in 1993. Brenneke and Jacque became "extremely close" in 2004.

Brenneke further testified that in June 2010, Jacque told Brenneke that Jacque was contemplating leaving Waller. But Jacque said "that she was afraid that Clay Waller would kill her if she left." Jacque told Brenneke

> that Clay told her that he was unhappy and that he wanted—and he was thinking about a divorce, and she said, Oh, you're unhappy. That works out really well, because I've been thinking the same thing.
>
> And . . . then all of a sudden he was kidding. And he got irate and . . . drug [Jacque] into the house by the hair of the head. The kids witnessed this. He threw her against a wall and knocked some pictures off. . . .

* * *

-4-

And he had went outside to get a gun or something, or [Jacque] thought he was leaving. She locked the door. And he kicked the door in. And [Jacque] told [Brenneke] that [Waller] said that divorcing him would be a death sentence.

According to Brenneke, Jacque was "very upset about it."

Brenneke testified that from July 2010 to March 2011, Jacque "continue[d] to confide in [her] that [Waller] was continuing to threaten her." Brenneke encouraged Jacque to leave Waller, telling Jacque that Waller was "all talk." But Jacque indicated to Brenneke that she believed the threats "to be very serious."

In March 2011, Jacque separated from Waller, and Jacque and the children moved in with Brenneke and her husband. While Jacque was at work, Brenneke and her family cared for the children. Jacque continued to confide in Brenneke that Waller "was continuing to threaten her life," a topic they discussed daily. According to Brenneke, Jacque "was scared to death." On one occasion, Waller told Jacque, "You think you're safe up there at your sister's. Well, you're not. I'll just wait for you to have to go to town and get you going to the grocery store." Jacque was afraid. "[S]he would not sit on the couch without the curtains being closed for fear he would snipe her from the woods . . . ." Waller told Jacque that "if he could not have her nobody would." He said that "[n]obody else was going to raise his kids." Waller told Jacque that "[i]t would be a death sentence to divorce him."

Brenneke "begged [Jacque] to go to the police," but Jacque insisted that going to the police would "just make it worse." Jacque told Brenneke that she was "documenting everything at work."

Brenneke testified that, prior to her disappearance on June 1, 2001, Jacque began dating another man, and the two were planning to move in together. Three days

before Jacque disappeared, Jacque told Brenneke that she had informed Waller about her new relationship. Jacque told Brenneke, "I just can't do it anymore. If he's going to kill me, he's going to kill me. I can't live like that anymore. That's not living."

On June 1, 2011, Jacque left to attend a meeting at a lawyer's office in Cape Girardeau where she and Waller were to sign divorce papers. Jacque told Brenneke that she would pick up her son, who had been visiting with his father, on the way home from the meeting. At 3:50 p.m. that afternoon, Jacque called Brenneke and told her that she just got out of the lawyer's office, and said that "[a]ll [she had] to do [was] run by and grab [her son] from [Waller's] house, and [would] be straight home." Brenneke expected Jacque to be home around 5:30 p.m. When she did not arrive as expected, Brenneke began calling and texting her. Jacque did not respond. Jacque's boyfriend was also unable to contact Jacque. Brenneke called her parents and told them "they had a problem." Unable to reach Jacque, Brenneke then called and texted Waller. After unsuccessfully trying to call and text him on several occasions, she left a message on Waller's phone, stating that if she did not hear from him within ten minutes, she would call the police. Waller immediately called her back and stated that the last time he had seen Jacque was at the lawyer's office. He told Brenneke that he had talked Jacque into letting him keep their son a few more days, which Brenneke did not believe. Brenneke frantically went downstairs and told her husband that "[h]e has killed her. I know he's killed her." Brenneke stated that there was never a doubt in her mind from that moment on June 1, 2011, that "[Waller] murdered my sister."

Brenneke reported Jacque as a missing person to the Jackson, Missouri Police Department. Brenneke also reported that Jacque had told her that Waller had threatened to kill her and their three children before and that she was worried.

Investigators soon verified that on June 1, 2011, at approximately 3:00 p.m., Jacque met with Waller at their divorce lawyer's office. After the meeting, Jacque telephoned her boyfriend and told him that she was on her way to Waller's house in

Jackson, Missouri, to pick up her son. That telephone conversation lasted until she arrived at Waller's residence, ending at 4:05 p.m. No one except Waller has seen or heard from Jacque since her arrival at Waller's residence.

A diary on Jacque's work computer contained summaries of some of the threats Waller made to Jacque. The diary entries contained the following threats:

- On Friday, December 3rd, I took the kids and went to my sister's house. Clay called me and I told him that I was going to file for divorce. He told me that he wanted [our son] and he was going to move with him to California. He said that was the only way he could ensure my safety. He said that he cannot live near me knowing that another man may be with me. He made numerous threats during this conversation. He asked me if I had someone lined out to raise our kids. He also said that he had a feeling that one of us would not be around to watch our kids grow up.

- On Saturday, December 4th, Clay threatened me again. He asked me why I didn't just take his gun out of my car, put it in my mouth and end myself so he could raise the kids.

- Wednesday, February 16th: Clay told me that he thought many times over the summer about killing himself and our kids so that I could start my new life. He also said that he is afraid that we won't see our kids grow up. He stated that he is starting to hate me and he will get me. Someday there might be a knock at the door and I open the door and get blown away.

* * *

- Friday, March 18th: Clay told me that I didn't deserve to live and he wishes he had a gun so he could blow my head off that day. He told me that a divorce would be my death sentence.

- Wednesday, March 23rd: Clay called me at 7 AM. He was threatening me and yelling at me. I met him at the airport. He told me that divorcing him was a death sentence. He would get me and, if he couldn't get to me, he would kill our kids. He would take them for a weekend fishing trip and then he would personally tell me they drowned so he could see my face. . . .

- June 2010: Clay was angry and told me never to keep his kids from him. He ran through the garage saying he was going to get his gun out of his truck. I stopped him before he got it. The kids came out to the garage and they went over to him and tried to comfort him.

- July 2010: In a rage, Clay started packing his bags. As he walked out, he hit my head against the wall and knocked pictures off. I thought he was done packing so I locked the door. He then kicked the door in and told me he was going to get his gun so I could blow my head off. The kids and I all ran outside. He got his gun out of his truck and tried to drag me by the hair into the house. I got away from him and was getting ready to run to a neighbor's house. He took the bullets out of the gun and then threw it to me. We then went inside and talked. I still have the gun.

- July 17, 2010: Clay took the kids camping. Before they left, he had me take a picture. He later told me that he had me take that picture because he planned to kill them that weekend because he knows that would be the way to hurt me the most.

- October 27, 2010: Clay asked me if we were going to get back together or not. I told him I still had trust issues. He stated that we could get divorced and he could get along with me but he will not stand for another man in his kids' lives. I told him that would not be a problem. He then told me that if I thought in a couple years that I could get a man and think everything would be find [sic], I am wrong. He said he would kill me, the kids and himself. I said, "So you are saying is that you would kill us all and he said, yes."

Special Agent Ritter investigated Jacque's disappearance and averred that, on June 2, 2011, at approximately 12:30 a.m., Waller called the Jackson Police Department to make a missing person report on his wife. According to Special Agent Ritter Waller told authorities that he and Jacque met at their attorney's office and that Jacque was supposed to bring a key to their post-office box to him at his residence. Waller admitted that Jacque later arrived at his residence, but he could not recall the time. Waller claimed that they sat and talked for a while and then napped. Waller reported that after the nap, they started to argue, and Jacque left the residence on foot. Waller stated that he then left the residence, and when he returned, her car was gone.

Special Agent Ritter further averred that, on June 2, 2011, at approximately 10:00 a.m., Jacque's vehicle was located on Interstate 55 northbound near the 105-mile marker in Jackson, Missouri. The vehicle was on the shoulder of the interstate with a flat tire.

That day, authorities executed a search warrant at Waller's residence. During the search, officers saw a hallway where children's play mats and toys had been placed on and along the carpet. The officers did not examine the floor under the mats at that time. But on June 6, 2011, Special Agent Ritter participated in a second search of Waller's residence, after the home owner[4] reported that carpet was missing from the residence. In re-examining the residence, Special Agent Ritter located and collected blood spatter evidence from two walls.[5] At a later time, Special Agent Ritter located and collected several pieces of carpet and carpet pad from a crawl space accessible in the basement of the residence. The carpet pieces and carpet pad were hidden from the back of the crawl space. One piece of carpet had a large blood stain on the bottom of the carpet and was hidden separately from the others in the crawl

---

[4]Waller did not own the home where he lived at the time.

[5]Blood spatter occurs when blood moves from one object through the air and lands on another object.

-9-

space. Tests confirmed that the blood located on the two walls and the blood on the piece of carpet contained Jacque's DNA.

Special Agent Ritter averred that, on July 11, 2011, he interviewed Waller. During the interview, Waller denied that Jacque came to his house to pick up their son and claimed that she came to the house for personal reasons and to talk about the bankruptcy. Waller said that his son was with his girlfriend at the time Jacque came by and was not at his house during her visit. Agent Ritter asked Waller if Jacque had ever been injured in the house. Waller paused and then said "yes," but he did not want to talk about it and said that "it was not a big deal." Waller later said that Jacque had an accident in the kitchen that made her face bleed. He stated that "she started bleeding like . . . a lot." Waller claimed that Jacque used her hands to catch the blood and ran through the house toward the bathroom. Waller claimed that he and Jacque cleaned up the blood together, and he never told the police about the blood because "it was no big deal." Waller then admitted that he cut up and removed the carpet with the blood on it and hid it in the crawl space. He said that he removed the carpet after the police conducted the first search warrant at the residence because he did not want the homeowner to find it and think that something wrong had happened. Waller claimed that when Jacque left the house, she was mad at him because he would not give her car keys to her, so he threw the keys up in the air, and they got stuck in a tree. Waller claimed he last saw Jacque walking away on foot.

Special Agent Ritter averred that, during the investigation, he interviewed Waller's father, James Clay Waller, Sr., who told authorities that Waller came to him a few days after Jacque went missing and confessed that he had killed her. Agent Ritter averred that "Waller told his father that the hole was already dug and he buried her with a shovel." While telling his father how he killed Jacque, Waller made a motion with his arms consistent with breaking her neck. Waller's father said his son was crying and emotional when he confessed to killing and burying Jacque. Waller's father told his son to turn himself in to the authorities or seek psychiatric treatment.

Brenneke stated that before she received the threat from Waller on July 26, 2011, there was no doubt in her mind that Waller had carried out his threat to kill Jacque. At that time, Brenneke was "totally devastated physically, emotionally, mentally, [and] psychologically." According to Brenneke, "looking for [her] sister . . . t[ook] a physical toll on [her]." She had "nightmares on what [Waller] might have done to [Jacque]," which "continue to this day."

Brenneke testified that, during this period of time, she thought about the loss of her sister "[c]onstantly" because she has "three reminders looking at [her] 24 hours a day." Brenneke was confident that Waller murdered her sister, but she did not know how he did it or where to find her sister. Brenneke envisioned "terrible things that might have happened to [Jacque.]" This affected Brenneke's "ability mentally to concentrate." She found routine things like paying bills difficult. Brenneke described for the court what her life was like and the effect the loss of her sister had on her before she received the threat, stating:

> Jacque wasn't just my sister. She was my best friend. And I've been devastated mentally, physically. I still haven't got to grieve, because I am consumed with keeping it all together for the children, keeping—I'm the oldest, you know, and to take care of my mom and dad. They're going through hell.

Brenneke testified that because Waller, in her mind, had killed her sister, as he had threatened to do, and on July 26, 2011, she was "greatly more vulnerable to a threat upon [her] life by Clay Waller than [she] would normally have been" because she "believe[d] he would be capable of doing anything at that point."

Brenneke testified that she learned about the threat from friends who called and expressed concern for her safety. She, too, was genuinely concerned. She considered the threat to be real, unrelated to the children's welfare, and immediately active. She noted the threat began with the words: "You are dead." She also knew that no one

believed that she would hurt her sister's children. Brenneke recalled that Waller had told Jacque that no one else would raise his kids. As the children's custodian, Brenneke felt that her life was threatened.

When she first saw the threat, she took immediate action. She "grabbed the kids," went to a friend's house, and waited for her husband to come home and make sure everything was secure. Brenneke, her husband, and other members of the family armed themselves. Brenneke and her husband kept the doors locked, updated the security system in their home, and kept the alarms set. They were on constant watch until Waller was arrested. If Waller is released from jail, Brenneke stated that they will "go back to lockdown mode." She stated that the effects of this threat will never leave her.

At the sentencing hearing, the government introduced additional evidence of Waller making threats and acting violently and deceitfully. On June 2, 1993, in a sworn statement given to police, 21-year-old former girlfriend and mother of Waller's child reported that Waller threatened her. She also reported that Waller told her that "if he can't have me, no one will." On June 15, 1993, the state court entered a Full Order of Protection, finding that Waller's former girlfriend had proven the allegations of abuse by a preponderance of the evidence. Waller was later convicted of assaulting his former girlfriend and received a 30-day suspended sentence. Waller's former girlfriend filed additional sworn statements alleging that, on three separate occasions between June 14 and June 21, 1993, Waller violated the Ex Parte Order of Protection. Waller was charged with three counts of violating an Ex Parte Order with regard to these incidents, but they were dismissed as part of a plea agreement.

On July 27, 2011, one day after threatening Brenneke's life, another one of Waller's former girlfriends filed a sworn complaint with the Cape Girardeau, Missouri Police Department, alleging that Waller told her in a telephone call that he was going to kill her husband. On July 29, 2011, the Cape Girardeau County Prosecuting

Attorney charged Waller with harassment, a class A misdemeanor, for threatening to kill his former girlfriend's husband. On July 27, 2011, an Adult Abuse Ex Parte Order of Protection was ordered based on a finding that there was an immediate and present danger of abuse by Waller.[6]

At the conclusion of this evidence, Waller's counsel argued against the vulnerable-victim enhancement. According to Waller's counsel, Brenneke did not meet the definition of a vulnerable victim. Specifically, he argued that the enhancement is only appropriate if the defendant knew or should have known that the victim of the offense was unusually vulnerable due to age or handicap. Counsel argued that, Brenneke's alleged vulnerability was not of the type described by the enhancement and that Waller had no knowledge of Brenneke's alleged vulnerability.

The district court "disagree[d] a little bit with [Waller's counsel's] characterization of [Brenneke's] vulnerability." The court found that Brenneke fit the criteria of being "otherwise particularly susceptible to criminal conduct . . . due to her close relationship with her sister[,] and her belief that [Waller] was capable of carrying out [the] threat that was made and for all of the other reasons that the Government ha[d] presented." The district court applied the two-level enhancement under U.S.S.G. §3A1.1(b)(1), which resulted in a Guidelines range of 10 to 16 months' imprisonment.

The government then argued in favor of a 60-month sentence under U.S.S.G. § 5K2.0 or as "a variance in light of the sentencing factors under 18 U.S.C. [§] 3553(a)." After hearing arguments from both parties and a statement from Waller, the court imposed Waller's sentence, explaining:

---

[6]At the time of the sentencing, Waller had also been charged in Cape Girardeau County with felony stealing by deceit. The charge was still pending.

Mr. Waller, I disagree with your lawyer's position that the fact that you've not been charged with a crime or convicted makes this a matter about the death of Jacque Waller off limits somehow on this sentencing hearing. That's not the law.

And [under] the sentencing guideline factors I'm not only entitled, but I'm required to look into the history and characteristics of the Defendant—that's you—in every respect possible, and that includes under the law even offenses that have not been charged or convicted if there's proof necessary to sustain those convictions.

The Court finds by a preponderance of the evidence that you did murder Jacque Waller. Now, let me be clear about that, I'm not suggesting in any way that I'm making that finding by a standard of proof beyond a reasonable doubt, that I am not making that finding by a standard of proof beyond a reasonable doubt. For purposes of this hearing I'm only required to make findings based on a preponderance of the evidence, and so that is my finding.

Your lawyer has also indicated that the murder of Jacque Waller and this particular threat are not so connected that they should be considered or that the murder should be considered in your sentencing, but I disagree with that too. Given the context of this case and having reviewed all the exhibits that the Government has submitted, particularly the affidavit from Mr. Ritter, the FBI agent, which encapsulates all the evidence, and hearing all the evidence here today and the other threats as well it's apparent to the Court that the murder and the threat in this case were inextricably intertwined.

For those reasons the Court is of the opinion that an upward variance is warranted.

I want you to know too that I'm considering all of the factors that I'm required to consider under Title 18, United States Code Section 3553(a). I mention that murder involves the provision about the history and characteristics of the Defendant.

-14-

There's another one that I want to respond to address specifically, and that's the guideline that 2(c). That's to protect the public from further crimes of the Defendant. Having read all the exhibits that were submitted by the Government, the Court is very concerned about protecting the public from the Defendant and in particular the specific victim of this crime and also in particular the children involved themselves.

As I say, I'm considering all of the various sentencing guidelines as well as the ones that I specifically mentioned. Therefore, pursuant to the Sentencing Reform Act of 1984 and the provisions of Title 18, United States [C]ode, Section 3553(a) and all of the factors thereunder. And also in view of the sentencing guidelines or the sentencing objectives of just punishment, general deterrence and incapacitation it's the judgment of the Court that you James Clay Waller is hereby committed to the Bureau of Prisons to be imprisoned for a term of 60 months. That's the maximum under the statute, as you know.

The court sentenced waller to 60 months' imprisonment. The government then inquired as to whether the court would have varied the sentence imposed even if it had concluded that the witness was not a vulnerable victim and the Guidelines range was 6 to 12 months. The court responded that it would have imposed "the full 60-month term."

## II. *Discussion*

On appeal, Waller argues that the district court erred by (1) applying the vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1), (2) finding that Waller murdered his wife and that the murder was inextricably intertwined with his threatening communication to Brenneke, (3) using the uncharged murder as a basis for an upward variance, and (4) imposing a substantively unreasonable sentence.

-15-

A. *Vulnerable-Victim Enhancement*

Waller first argues that the district court procedurally erred in applying the vulnerable-victim enhancement under § 3A1.1(b)(1). Specifically, he argues that the enhancement does not apply because Brenneke was not physically or mentally disabled in any sense known to Waller or otherwise vulnerable in the sense used by the Guidelines. In response, the government argues that the district court did not err in imposing the two-level enhancement and that, even if it did, such error was harmless because the district court stated on the record that it would have imposed the same 60-month sentence regardless of whether the two-level enhancement applied.

"We review de novo whether the district court correctly interpreted and applied the sentencing [G]uidelines, while the court's factual findings are reviewed for clear error." *United States v. Koch*, 625 F.3d 470, 480 (8th Cir. 2010).

When reviewing a district court's imposition of a sentence, we "must first ensure that the district court committed no significant procedural error." *Gall v. United States*, 552 U.S. 38, 51 (2007). "Procedural error includes failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quotations and citation omitted). "A failure to properly calculate the advisory Guidelines range is a significant procedural error, and a non-harmless error in calculating the [G]uidelines range requires a remand for resentencing." *United States v. Woods*, 670 F.3d 883, 886 (8th Cir. 2012) (quotation and citation omitted). "However, a district court's Guidelines computation error is harmless if the government can show the procedural error did not substantially influence the outcome of the sentencing proceeding." *Id.* (quotation and citation omitted).

Under these facts, we need not determine whether the district court procedurally erred in applying the vulnerable-victim enhancement under § 3A1.1(b)(1) because any such error would be harmless. Assuming that procedural error occurred, "[t]he record indicates that the district court intended to sentence [Waller] to [60] months." *Id.; see also United States v. Goodyke*, 639 F.3d 869, 875 (8th Cir. 2011) ("That the district court wanted to get to a seventy-five-month sentence is fairly obvious from the transcript."); *United States v. Sanchez–Martinez*, 633 F.3d 658, 660–61 (8th Cir. 2011) (concluding any error was harmless because the record clearly indicated the district court would have imposed the same sentence regardless of the error). The district court specifically stated that "[r]egardless of the sentencing guidelines whether they were 6 to 12 months or 10 to 16 months it's the Court's intention for all the reasons previously stated that I was going to impose the full 60-month term."

## B. *Murder Finding*

Waller next argues that the district court erred in finding by a preponderance of the evidence that he "murdered" his missing wife and that the alleged murder is "inextricably intertwined" with his threats to Brenneke. According to Waller, although the rules of evidence and the right of confrontation do not apply at sentencing, because the sentence enhancement increased the sentence from a range of 6 to 12 months to the statutory maximum of 60 months, "due process may well have required more than the limitless acceptance of hearsay and speculation."

After the district found by a preponderance of the evidence that Waller murdered his wife and that the murder was inextricably intertwined to the threat Waller made to Brenneke, Waller did not object. Because "[Waller] failed to raise any objection to th[is] alleged procedural error before the district court . . . our review is for plain error." *United States v. Mireles*, 617 F.3d 1009, 1012 (8th Cir. 2010). "Under plain error review, the defendant must show: (1) an error; (2) that is plain; and

-17-

(3) that affects substantial rights." *Id.* (quotation and citations omitted). "A plain error will not be corrected unless (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1013 (quotation and citation omitted). "A sentencing error is prejudicial if there is a reasonable probability the defendant would have received a lighter sentence but for the error." *Id.* (quotation and citation omitted).

We have rejected the assertion that "due process require[s] the government to prove by clear and convincing evidence facts that produce[] so substantial an increase in [a defendant's] [G]uidelines range." *United States v. Villareal-Amarillas*, 562 F.3d 892, 895 (8th Cir. 2009). This court has explained:

> Under the prior mandatory Guidelines regime, we repeatedly held "that the facts relied upon by the district court at sentencing need be proved only by a preponderance of the evidence." *United States v. Wise*, 976 F.2d 393, 400 (8th Cir. 1992) (en banc); *United States v. Gooden*, 892 F.2d 725, 727–28 (8th Cir. 1989), *cert. denied*, 496 U.S. 908, 110 S. Ct. 2594, 110 L. Ed. 2d 274 (1990). However, for many years, we have recognized, but never applied, an exception to this general standard—due process requires that sentencing determinations "that have an 'extremely disproportionate' effect on a defendant's sentence" be proved by clear and convincing evidence. *United States v. Garth*, 540 F.3d 766, 773 (8th Cir. 2008). As we will explain, this principle derives from a misreading of the Supreme Court's decision in *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L. Ed. 2d 67 (1986). We now join three other circuits in concluding that, even if valid when the Guidelines were mandatory, this principle did not survive the Supreme Court's recent decisions in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), and *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007).

*Id*. Because due process is not implicated, this court must only determine whether the district court clearly erred in finding that Waller murdered his wife and that the murder was inextricably intertwined with the underlying offense.

> Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. If the district court's fact-findings are plausible in light of the record viewed in its entirety, they must be affirmed, regardless of how this court might have weighed the evidence in the first instance. When a factual finding is supported by substantial evidence, it is not clearly erroneous.

*F.T.C. v. Lundbeck, Inc.*, 650 F.3d 1236, 1239 (8th Cir. 2011) (quotation and citation omitted).

The evidence that the government presented to the district court at the sentencing hearing makes the district court's factual findings "plausible" by a preponderance of the evidence. First, Waller repeatedly threatened to kill his wife. Second, Jacque vanished four days after telling Waller that she was in a relationship with another man, and shortly after she met with Waller to sign divorce papers at an attorney's office. Third, Waller was the last person to see Jacque alive. Fourth, shortly after Jacque went into Waller's residence, Waller did not answer Brenneke's phone calls, but he responded when she left him a message saying that if she did not receive a response within ten minutes, she was going to call the police. Fifth, Waller initially lied to Brenneke by denying that Jacque had been at his residence; later, Waller told police that Jacque had been "napping" at his residence, that he had thrown her keys into a tree, and that Jacque had left on foot. Sixth, in his first interview with authorities, Waller did not mention Jacque being injured at his residence. Seventh, authorities found spatters of Jacque's blood on the walls at Waller's residence. Eighth, authorities found pieces of carpet hidden in the crawl space of Waller's basement with Jacque's blood on them. Ninth, Agent Ritter averred that Waller admitted cutting up the carpet and hiding it, giving the explanation that he did it because he did not want

-19-

his landlord to find out and "think that something happened." Tenth, Waller's father stated that Waller admitted that he killed Jacque and that he had buried her, having already dug the hole ahead of time.

It is also plausible that "the murder and the threat in this case were inextricably intertwined," as the district court found. The recipient of the threat—Brenneke—is the sister of Waller's "missing" wife. Waller posted the threat to Brenneke on a website dedicated to following developments in the disappearance of his wife. At the time that Waller made the threat, Brenneke had custody of Waller's three children with Jacque. Brenneke testified that the threat put her in fear for her life and caused her to take immediate precautions to protect herself, her family, and Jacque's three children. According to Brenneke, at the time of the threat, she believed that Waller had murdered her sister and was now threatening to kill her.

Under these facts, the district court did not err in finding by a preponderance of the evidence that Waller murdered his missing wife and that the alleged murder is inextricably intertwined with the threatening communication to Brenneke.

### C. *Consideration of Murder Finding in Upward Variance*

Waller next asserts that the district court erred in considering that he murdered Jacque when imposing the upward variance. According to Waller, "[o]ther crimes charged, convicted, or proven are not double counted as a separate component of 'character' or the 'history and characteristics' of the defendant." Waller maintains that his alleged murder of his wife was not related to his threat to kill Brenneke and cannot be considered.

At sentencing, Waller's counsel did not argue that the district court could not rely on unrelated and uncharged criminal conduct as a basis for an upward variance, nor did Waller's counsel raise any further procedural objections to the sentence when specifically asked by the court whether there was "anything further from the

-20-

Defendant" prior to the conclusion of the hearing. Because Waller did not object to the district court's imposition of an upward variance at sentencing, we review the district court's decision for plain error. *See United States v. Alexander*, 517 F.3d 887, 889 (6th Cir. 2008) ("Because Alexander did not object to the upward variance when asked at the sentencing hearing, we review his sentence for plain error.").

Here, the district court found by a preponderance of the evidence that Waller murdered his wife. This act constitutes

> criminal misconduct. Like other prior criminal conduct, whether or not related to the offense of conviction, it is part of 'the history and characteristics of the defendant' that the district court 'shall consider' in imposing an appropriate sentence, 18 U.S.C. § 3553(a)(1), and it may be relevant in a particular case to the factors enumerated in § 3553(a)(2).

*United States v. Loaiza-Sanchez*, 622 F.3d 939, 942 (8th Cir. 2010) (citing *United States v. Jenners*, 537 F.3d 832, 835–36 (8th Cir. 2008) (noting that a court may consider uncharged criminal conduct)); *United States v. Comer*, 93 F.3d 1271, 1284 (6th Cir. 1996) (holding that a sentencing court may consider acquitted conduct or uncharged criminal conduct); *United States v. Aideyan*, 11 F.3d 74, 76 (6th Cir.1993) ("A sentencing court may consider prior criminal conduct, whether or not charged . . . ."). Thus, we conclude that the district court did not err, plainly or otherwise, in varying upward based on its finding that Waller murdered his wife.

### D. *Substantive Reasonableness of Waller's Sentence*
Finally, Waller argues that his sentence is substantively unreasonable.

> In the absence of procedural error below, we . . . consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. In conducting this review, we are to take into account the totality of the circumstances, including the extent of any

variance from the Guidelines range. If the defendant's sentence is within the Guidelines range, then we may, but [are] not required to, apply a presumption of reasonableness. But we are not permitted to apply a presumption of unreasonableness if the sentence is outside the Guidelines range. Instead, we may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. We may not require "extraordinary" circumstances to justify a sentence outside the Guidelines" and are prohibited from the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence. Just because we might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

*Feemster*, 572 F.3d at 461–62 (quotations and citations omitted) (alteration in original). "[S]ubstantive appellate review in sentencing cases is narrow and deferential." *Id*. at 464 (quotation and citation omitted). "[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *Id*. (quotation and citation omitted).

"Here, the district court's justifications for imposing a [60]-month sentence rest[] on precisely the kind of defendant-specific determinations that are within the special competence of sentencing courts, as the Supreme Court has repeatedly emphasized." *Id*. (quotation and citation omitted) (second alternation in original). The district court specifically considered "the history and characteristics of the Defendant," which "includes under the law even offenses that have not been charged or convicted if there's proof necessary to sustain those convictions." In varying upward, the court stated that it had considered "all of the factors that I'm required to consider under Title 18, United States Code Section 3553(a)." The court "mention[ed] that murder involves the provision about the history and characteristics of the

Defendant." The court also specifically addressed § 3553(a)(2)(C)—the need for the sentence imposed "to protect the public from further crimes of the Defendant." But the court reiterated that it had considered "all of the various sentencing [G]uidelines as well as the ones that I specifically mentioned." Under these facts, the district court did not abuse its broad discretion.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

———————————————