PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

HARRY LOUIS HARGROVE,

        *Defendant-Appellant.*

No. 11-4818

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
Terrence W. Boyle, District Judge.
(7:10-cr-00135-BO-1)

Argued: October 24, 2012

Decided: December 12, 2012

Before NIEMEYER, SHEDD, and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Shedd wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

---

## COUNSEL

**ARGUED:** James Edward Todd, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public

Defender, G. Alan DuBois, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

**OPINION**

SHEDD, Circuit Judge:

Based on his involvement in dogfighting activity, Harry Louis Hargrove was convicted of violating one provision of the Animal Welfare Act, 7 U.S.C. § 2156. He now appeals his 60-month sentence. Finding no reversible error, we affirm.

I

The government describes Hargrove as being a "legend" in the dogfighting community. By Hargrove's own admission, he has been involved in dogfighting activity for over four decades, and at one time he had approximately 250 fighting dogs on his property. Information in the record shows that offspring from one of Hargrove's fighting dogs, Midnight Cowboy, sold for large sums of money across the country because of its aggressiveness and propensity for fighting. Hargrove advertised his dogs in various dogfighting-related publications, and he is famous in the dogfighting industry for his dogfighting, his breeding activities, his training regimen, and his ability to produce aggressive fighting dogs. His prior criminal history includes a 1983 Georgia felony dogfighting conviction, a 1993 North Carolina animal fighting misdemeanor conviction, and a 2001 North Carolina animal cruelty misdemeanor conviction.

The investigation underlying this case began with complaints that Hargrove was involved in dogfighting on his property in Duplin County, North Carolina. During the investigation Hargrove sold an American Pit Bull Terrier to an undercover informant. The sale was consummated after Hargrove demonstrated the dog's prowess by fighting it with another dog on his property. Pursuant to a search warrant, law enforcement officers seized 34 additional dogs which were eventually euthanized because of poor health, aggressive tendencies, or both. Additionally, the officers found multiple tools and indicia of the dogfighting trade throughout Hargrove's property, including: a fighting pit that was covered in a significant amount of blood; "break sticks" which are used to break the bite hold of a dog during a fight; modified jumper cables that were used to electrocute dogs; a large debris pit that contained, among other things, dog carcasses; a blood-covered treadmill with wooden sides; a springpole, which is used to build up a dog's leg and jaw muscles; an old "jenny," which is used to increase a dog's stamina by having the dog run continuously for extended periods of time while chasing a bait; large quantities of animal medicines; and hundreds of canine pedigrees.

The government charged Hargrove in one count with violating § 2156(b), which makes it unlawful "for any person to knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." The statutory maximum for this offense is 60 months. *See* 18 U.S.C. § 49. Without a plea agreement, Hargrove pled guilty to the charge. Before sentencing, a probation officer calculated Hargrove's advisory guideline range to be 10-16 months. Objecting to this calculation, Hargrove argued that the range should be 0-6 months.

While not taking issue with the probation officer's calculation, the government filed a motion for an upward departure and/or a variance. As grounds for the upward departure, the government listed extraordinary cruelty to animals, extreme

conduct, and inadequacy of Hargrove's criminal history category. As grounds for the upward variance, the government noted the violent nature of dogfighting, Hargrove's long-standing involvement in dogfighting activities, the need for deterrence, the need to protect the public, and the need to avoid sentencing disparities. In support of the motion, the government submitted a memorandum that included documentary and photo exhibits which detailed the condition of the dogs seized from Hargrove's property, a video clip of the demonstration fight Hargrove arranged for the undercover informant, and photos taken during the execution of the search warrant on Hargrove's property.

At the beginning of the sentencing hearing, the district court noted the probation officer's recommended advisory guideline range of 10-16 months and then heard Hargrove's objections. Again, Hargrove contended that the range should be 0-6 months. After hearing from Hargrove, the court discussed with the probation officer the possibility of additional increases to the offense level calculation for more than minimal planning, vulnerable victims, and role in the offense. The court then informed the parties that it intended to rely on these enhancements to increase the recommended offense level.

The district court then invited the government to present evidence in support of its motion for an upward departure or a variance. Among other things, the government presented the testimony of Special Agent Mark Barnhart, who described the tools of the dogfighting trade that trainers use to increase a dog's aggressiveness and stamina, recounted the results from the search of Hargrove's property, and described the injuries that dogs often sustain during fights. The government then repeated its request for an upward departure or, alternatively, for an upward variance pursuant to 18 U.S.C. § 3553(a). Regarding the variance request, the government pointed to the violent nature of dogfighting and Hargrove's long-standing involvement in breeding and training dogs for fighting. The government also noted that Hargrove had not been deterred

by his prior dogfighting-related convictions, and it stated that he deserved a longer sentence than other federal dogfighting convicts. The government requested a departure or variance up to the statutory maximum term of 60 months.

The district court announced that it was prepared to sentence Hargrove both under the guidelines and with an upward departure and upward variance. The court expressed its dissatisfaction with the "irrationality" of the dogfighting guideline provision, noting with respect to the guideline calculation of 0-6 months that Hargrove advocated: "I would say that other than the criminal dog fighters in America, every other person in America would be shocked beyond belief that you could do what [Hargrove] did and come out with a federal sentence of zero to six months. . . . No one could defend that. No judges. No legislators. No president." J.A. 135.

The court then heard from Hargrove's counsel, who emphasized that Hargrove was a highly decorated military veteran who had been changed by his experience in Vietnam. Counsel also noted that in cases cited by the government involving similar activities, the defendants received imprisonment sentences of between 12 and 24 months. Finally, counsel emphasized that Hargrove had been fully compliant with his release conditions following his arrest. Hargrove then addressed the court, stating that he thought his involvement in dogfighting was wrong and that he had been backing away from it for years.

The court then announced that its guidelines calculations led to a sentencing range of 41-51 months, and it stated that it would sentence Hargrove to 51 months if imposing sentence under that range. However, the court further stated that an upward departure and an upward variance to 60 months were appropriate. In response to a query from the government, the court stated: "If I had sustained the Defendant's objections and come up with a Guideline range that the Defendant did not object to, I would still have imposed both

the upward departure to 60 months and an upward variance to 60 months." J.A. at 147.[1]

In a written statement setting forth the reasons for imposing a sentence outside the guideline range, the court explained:

> [T]he court found under [18 U.S.C. §] 3553 that the nature of the offense was extreme cruelty, the [history] and characteristics of the defendant were such that he lack[ed] any remorse or sympathy for his actions and that he had been engaged undeterred in this behavior for over 40 years showing also a lack of respect for the law. The sentence is a [deterrence] for future crimes and diminishes unwarranted sentencing [disparities] among similarly situated defendants.

J.A. 176.

## II

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors." *Freeman v. United States*, 131 S.Ct. 2685, 2692 (2011) (quoting 18 U.S.C. § 3553(a)). Under the current sentencing regime, "district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), subject to appellate review for 'reasonableness.'" *Pepper v. United States*, 131 S.Ct. 1229, 1241 (2011).

---

[1]The court's comments indicate its intent to both depart and vary upward, but the Judgment indicates that the court only varied upward from the guideline range. *See* J.A. 175-76. For our purposes, this apparent discrepancy is immaterial. *See United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir.), *cert. denied*, 131 S.Ct. 2946 (2011) (noting "the practical effects of applying either a departure or a variance are the same").

"Reasonableness review has procedural and substantive components." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). "Procedural reasonableness evaluates the method used to determine a defendant's sentence. . . . Substantive reasonableness examines the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *Mendoza-Mendoza*, 597 F.3d at 216.

A.

Although the sentencing guidelines are only advisory, improper calculation of a guideline range constitutes significant procedural error, making the sentence procedurally unreasonable and subject to being vacated. *United States v. Clay*, 627 F.3d 959, 970 (4th Cir. 2010). Hargrove argues that he should be resentenced because the district court incorrectly applied three sentencing enhancements and incorrectly determined his relevant conduct. He maintains that, without these errors, his guideline range would have been 0-6 months rather than the 41-51 month range used by the court. The government concedes that the court erroneously calculated Hargrove's guideline range by misapplying two enhancements. Of course, we are not bound by the government's concession of error, *United States v. Boulware*, 604 F.3d 832, 837 (4th Cir. 2010), but if we agreed with the government and if we ended the analysis at this point, we would be compelled to vacate Hargrove's sentence and remand for resentencing.

However, as with most types of errors in a criminal proceeding, "procedural errors at sentencing . . . are routinely subject to harmlessness review." *Puckett v. United States*, 556 U.S. 129, 141 (2009); *see also Zedner v. United States*, 547 U.S. 489, 507 (2006) (noting that "[h]armless-error review . . . presumptively applies to *all* errors where a proper objection is made" (emphasis in original; internal quotation marks omit-

ted)).**²** In order to prevail on harmlessness review, the government must show that an error did not affect a defendant's "substantial rights." *United States v. Robinson*, 460 F.3d 550, 557 (4th Cir. 2006). A sentencing error is harmless "if the resulting sentence was not longer than that to which [the defendant] would otherwise be subject." *United States v. Mehta*, 594 F.3d 277, 283 (4th Cir. 2010) (internal quotation marks omitted). In performing harmless-error review, an appellate court may assume that a sentencing error occurred and proceed to examine whether the error affected the sentence imposed. *See, e.g.*, *Jones v. United States*, 527 U.S. 373, 402 (1999) (discussing harmless-error review of death sentences).

The government contends that regardless of any errors the district court may have made in calculating Hargrove's guideline range, the errors are harmless and resentencing is unnecessary because the court expressly imposed a substantively reasonable alternate sentence based on the § 3553(a) factors. For support, the government specifically points to our decision in *United States v. Savillon-Matute*, 636 F.3d 119 (4th Cir.), *cert. denied*, 132 S.Ct. 454 (2011).

In *Savillon-Matute*, the defendant appealed his 36-month upward variance sentence, arguing that he should be resentenced because the district court incorrectly increased his base offense level by eight levels. The propriety of that offense-level enhancement hinged on the applicability of the modified categorical approach established in *Shepard v. United States*, 544 U.S. 13 (2005), as it pertained to the defendant's prior conviction. Without the asserted guideline calculation error, the guideline range would have been 4-10 months rather than the 12-18 month range applied by the court. Using an "assumed error harmlessness inquiry," we affirmed the sentence

---

**²**Harmlessness review is mandated generally by 28 U.S.C. § 2111 and Fed. R. Crim. P. 52(a).

"without reaching the merits of the claimed guideline error." *Savillon-Matute*, 636 F.3d at 123-24.

As we explained, the assumed error harmlessness inquiry "requires (1) 'knowledge that the district court would have reached the same result even if it had decided the guidelines issue the other way,' and (2) 'a determination that the sentence would be reasonable even if the guidelines issue had been decided in the defendant's favor.'" *Id.* at 123 (quoting *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006)). We explained the point underlying this inquiry: "'[I]t would make no sense to set aside [a] reasonable sentence and send the case back to the district court since it has already told us that it would impose exactly the same sentence, a sentence we would be compelled to affirm.'" *Savillon-Matute*, 636 F.3d at 123 (quoting *Keene*, 470 F.3d at 1350).[3]

Applying the inquiry to the facts of that case, we concluded with respect to the first part of the analysis that although the district court did not specifically state that it would have imposed the same sentence without the enhancement, its comments throughout the sentencing hearing showed that it would have done so. As to the second part of the analysis, we concluded that even if the correct guideline range was 4-10 months, the court adequately explained the sentence in accord with the § 3553(a) factors.

We have applied *Savillon-Matute* in several subsequent cases. *See, e.g.*, *United States v. Shrader*, 675 F.3d 300, 315

---

[3]We had previously reviewed an alternate sentence in performing harmlessness review. In *United States v. Revels*, 455 F.3d 448 (4th Cir. 2006), we found the district court's Sixth Amendment error in applying the sentencing guidelines in a mandatory fashion to be harmless where the court announced, as an alternate sentence, that it would have imposed the same sentence under § 3553(a) using an advisory guideline system. We noted that resentencing in that instance would be "little more than an empty formality, for the sentence the district court would impose on remand is a foregone conclusion." *Id.* at 452.

(4th Cir. 2012) ("We . . . need not address the propriety of the ACCA enhancement, because an upward variance or departure in this case would produce exactly the same result and because the transcript makes clear that the sentence herein, irrespective of any ACCA enhancement, plainly effectuated the trial court's sentencing intent."); *United States v. Rivera-Santana*, 668 F.3d 95, 103 (4th Cir. 2012) (explaining that "we are, in any event, entitled to affirm the sentence imposed — assuming its substantive reasonableness — because any procedural error that may have been made in calculating either of the two departures would necessarily be harmless"). Other circuit courts of appeals have ruled similarly. *See, e.g.*, *United States v. Waller*, 689 F.3d 947, 958 (8th Cir. 2012); *United States v. Richardson*, 676 F.3d 491, 510-511 (5th Cir. 2012); *United States v. Hill*, 645 F.3d 900, 912-13 (7th Cir. 2011).

Hargrove contends that *Savillon-Matute* must be read narrowly to apply only under the unique circumstances of that case (*i.e.*, involving the *Shepard* issue), and that application of the assumed error harmlessness inquiry in this case runs afoul of well-settled precedent requiring the district court to calculate the guidelines correctly. In his view, reviewing sentences under that inquiry "would erode any incentive for district courts to address and accurately decide Guideline issues and would grant them a degree of discretion almost exactly comparable to what they enjoyed in the pre-Guidelines system." *Reply Brief for Appellant*, at 13. We disagree.[4]

---

[4]At oral argument, Hargrove asserted that an alternate sentence such as the one imposed in this case constitutes structural error that is not susceptible to harmlessness review. We find no merit to this assertion. *See Washington v. Recuenco*, 548 U.S. 212, 218 (2006) ("Only in rare cases has this Court held that an error is structural, and thus requires automatic reversal."); *United States v. White*, 405 F.3d 208, 222 (4th Cir. 2005) ("We decline to classify the error of sentencing a defendant under the pre-*Booker* mandatory guidelines regime as a structural error.").

As an initial matter, we reject Hargrove's narrow reading of *Savillon-Matute*. Although the precise legal issue there did involve the potential application of *Shepard*, the broader question before us was the reasonableness of the sentence in light of the defendant's claim that his guideline range was miscalculated. In that regard, *Savillon-Matute* is indistinguishable from this case.

In any event, we believe that Hargrove misstates the impact of the assumed error harmlessness inquiry. The guidelines "provide a framework or starting point . . . for the [district court's] exercise of discretion," *Freeman*, 131 S.Ct. at 2692, and "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall v. United States*, 552 U.S. 38, 49 (2007). However, consistent with the basic mandate that we review most errors for harmlessness, the assumed error harmlessness inquiry is an appellate tool that we utilize in appropriate circumstances to avoid the "empty formality" of an unnecessary remand where it is clear that an asserted guideline miscalculation did not affect the ultimate sentence. This appellate standard of review does not allow district courts to ignore their responsibility to consider the guidelines in a meaningful manner when sentencing a defendant. *See generally Rita v. United States*, 551 U.S. 338, 351 (2007) (noting that the presumption of reasonableness of a within-guidelines sentence applies only on appellate review and does not affect the district court's sentencing obligations). Nothing in *Savillon-Matute* suggests otherwise, and the district court below certainly did not fail to consider the guidelines in a meaningful manner (even if, as the parties agree, it erred in its sentencing range calculation).[5]

---

[5]Likewise, the district court in *Savillon-Matute* appears to have carefully considered the guidelines, but it simply chose a sentencing range that differed from what the defendant sought.

B.

We now apply the assumed error harmlessness inquiry to the facts of this case. Under the first step of the analysis, we have no difficulty in concluding that the district court would have sentenced Hargrove to 60 months even if the guideline range was 0-6 months. The court expressly told us so. The dispositive question, therefore, is whether the upward variance to 60 months from an assumed guideline range of 0-6 months is substantively reasonable under the facts of this case. Mindful of our deferential standard of review, *Savillon-Matute*, 636 F.3d at 124, we conclude that it is.

The fact that "a variance sentence deviates significantly from the advisory Guidelines range . . . does not alone render it presumptively unreasonable." *Rivera-Santana*, 668 F.3d at 106. When reviewing substantive reasonableness, we "may consider the extent of the deviation [from the guidelines range], but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51. Section 3553(a) instructs the district court to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing (*i.e.*, retribution, deterrence, incapacitation, and rehabilitation); (3) the sentences legally available; (4) the sentencing guidelines; (5) any Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. The record reflects that the district court conducted a thorough individualized assessment of Hargrove and his offense conduct in light of these factors.

For example, the district court was well aware of the nature and circumstances of Hargrove's offense. The presentence investigation report, the government's sentencing memorandum, and the testimony of Special Agent Barnhart detailed Hargrove's cruel and barbaric treatment of the dogs he trained to fight. The court was also able to view evidence pertaining

to Hargrove's mistreatment of dogs, and it described the offense conduct as being "incredibly barbaric." J.A. 134.

In addition, the district court considered Hargrove's history and characteristics. While acknowledging that Hargrove was a military veteran who had provided heroic service to his country, the court noted that he chose to "discard all of that for this life of brutality and life of cruelty." J.A. 137. The court observed that Hargrove's involvement in dogfighting became "the most prominent, distinguishing characteristic of his life," J.A. 138, and it questioned whether Hargrove truly appreciated the wrongfulness of his conduct and accepted full responsibility for the damage his behavior caused.

The district court also considered the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct. The court knew from Hargrove's admissions that he had been involved in dogfighting and training for several decades and that it was difficult for him to keep away from dogfighting because it was a big part of his life. Additionally, the court noted that Hargrove planned his extensive involvement in this criminal activity, and it expressed concern about the danger that his conduct presented to others, stating that he was "introducing into the society . . . animals who have been so deranged that they become a threat, a danger to humanity." J.A. 140.[6]

---

[6]In arguing that his sentence is substantively unreasonable, Hargrove points to other dogfighting sentences and contends that his sentence creates an improper sentencing disparity. "Put succinctly, we are unwilling to isolate a possible sentencing disparity to the exclusion of all the other § 3553(a) factors." *Rivera-Santana*, 668 F.3d at 106 (internal quotation marks omitted). In any event, we find that cases cited by Hargrove do not involve similarly situated defendants. Hargrove also contends that because he received the statutory maximum sentence, he received no credit for his acceptance of responsibility. However, the record reflects that acceptance of responsibility was included in the guideline calculation (at any range), and we hold that a sentence is not *per se* unreasonable simply because the district court imposes a sentence at the statutory maximum on a defendant who has accepted responsibility.

In short, the court made abundantly clear that even if Hargrove's sentencing guideline range was 0-6 months, it believed a 60-month sentence was necessary to accomplish the objectives of sentencing. Given the record before us, we cannot conclude that the court's exercise of its sentencing discretion in imposing a 60-month sentence is unreasonable.

### III

Based on the foregoing, we affirm Hargrove's sentence.

*AFFIRMED*