**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-4475

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KENDALL DEMARKO WYSINGER, a/k/a Demarko, a/k/a D,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Elizabeth Kay Dillon, District Judge.  (5:17-cr-00022-EKD-JCH-1)

Argued:  December 8, 2021                     Decided:  March 30, 2023

Before HARRIS and RUSHING, Circuit Judges, and KEENAN, Senior Circuit Judge.

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge Harris and Senior Judge Keenan joined.

**ARGUED:**  Paul Graham Beers, GLENN, FELDMAN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellant.  Laura Day Rottenborn, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.  **ON BRIEF:**  Daniel P. Bubar, Acting United States Attorney, Roanoke, Virginia, Jennifer R. Bockhorst, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee.

RUSHING, Circuit Judge:

Defendant Kendall Demarko Wysinger and his partner Leslee Garza conspired to ensnare drug-addicted women in debt-cycle sex trafficking. Wysinger would give the women heroin and cocaine they could not afford and then insist they repay their debt by prostituting themselves for his benefit throughout Virginia, West Virginia, and Maryland. On March 23, 2016, Wysinger provided fentanyl to two women who overdosed. Wysinger left the women for dead and destroyed the evidence. One of the women died, but the other survived and testified against him.

A jury convicted Wysinger of (1) conspiracy to commit sex-trafficking, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c); (2) interstate transportation for the purpose of prostitution, in violation of 18 U.S.C. § 2421; (3) distribution of, and possession with intent to distribute, fentanyl, the use of which resulted in death, in violation of 21 U.S.C. § 841, *et seq.*; and (4) distribution of, and possession with intent to distribute, fentanyl, the use of which resulted in serious bodily injury, in violation of 21 U.S.C. § 841, *et seq.*[1] At sentencing, the district court found that Wysinger had a prior conviction for a felony drug offense, triggering a mandatory life sentence on Counts 3 and 4 pursuant to 21 U.S.C. § 841(b)(1)(C). The court sentenced Wysinger to life in prison on Counts 1, 3, and 4, and 120 months' imprisonment on Count 2, all to be served concurrently.

Wysinger now appeals his convictions and sentence. We affirm in full.

---

[1] The jury also convicted Wysinger of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1), but the district court set that conviction aside on Wysinger's motion. The jury acquitted Wysinger on a second obstruction charge.

## I.

Wysinger first challenges his Count 1 conviction for conspiracy to violate 18 U.S.C. § 1591, which criminalizes sex trafficking by force, fraud, or coercion. He argues that the evidence was insufficient to support his conviction and that the district court instructed the jury incorrectly. We take each argument in turn.

## A.

We review the sufficiency of the evidence de novo, sustaining the verdict if, "viewing the evidence in the light most favorable to the Government, it is supported by substantial evidence." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (internal quotation marks omitted). The jury, not the reviewing court, weighs credibility and resolves conflicts in the evidence; and "if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal quotation marks omitted). A defendant bringing a sufficiency challenge therefore bears "a heavy burden," and reversal is warranted only "where the prosecution's failure is clear." *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012) (internal quotation marks and citation omitted).

As relevant here, Section 1591 criminalizes knowingly recruiting, enticing, harboring, transporting, providing, obtaining, or maintaining a person, knowing or in reckless disregard of the fact "that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1). Nearby 18 U.S.C.

§ 1594(c) criminalizes conspiracy to violate Section 1591.  Wysinger challenges the sufficiency of the evidence to prove the coercion and conspiracy elements.

1.

Wysinger first contends the Government did not prove that he used or conspired to use coercive means to cause his victims to prostitute themselves.  The statute defines "coercion" to include "threats of serious harm to or physical restraint against any person" and "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." *Id.* § 1591(e)(2)(A)–(B).  "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." *Id.* § 1591(e)(5).

The Government's theory was that Wysinger intended—and in at least one case succeeded—to recruit women with drug addictions by fronting them drugs and then, once they began working for him, to keep the money they made from prostitution and give the women more drugs only when they earned him more money.  In support, the Government presented testimony from 23 witnesses, including two victims, law enforcement officers, associates of Wysinger, and experts.  An expert in drug dependence explained heroin and fentanyl addiction and withdrawal sickness.  An expert in commercial sex trafficking testified about the difference between voluntary prostitution and sex trafficking, including the debt-bondage relationship created by pimps who compel prostitution through drug

dependence.  Ultimately, the Government contended that Wysinger conspired to employ a "scheme, plan, or pattern" intended to cause the women to believe that if they failed to engage in commercial sex acts, they would incur a "serious harm" by going into drug withdrawal.  *Id.* § 1591(e)(2).

Wysinger does not dispute that manipulating vulnerable women by exploiting their drug addictions in exchange for prostitution services can be coercion within the meaning of Section 1591 or, put another way, that the Government's theory is a permissible one. *See*, *e.g.*, *United States v. Mack*, 808 F.3d 1074, 1078, 1081–1082 (6th Cir. 2015) (upholding conviction for sex trafficking where defendant "recruit[ed] young female addicts" and exploited their addictions to coerce them "to prostitute themselves for his benefit"); *United States v. Fields*, 625 Fed. App. 949, 952 (11th Cir. 2015) (upholding sex-trafficking conviction where defendant coerced his victims to engage in commercial sex acts by "causing them to experience withdrawal sickness if they did not engage in prostitution").  Nor does he contest that withdrawal symptoms can be "serious harm" within the statute's broad definition of that term.  Instead, Wysinger argues his conduct was not as egregious as that of defendants in other cases and that, in any event, the evidence simply did not prove the Government's theory.  He claims that his relationship with the victims was "voluntary and collaborative," highlighting evidence that he was not violent with the women, that they had previously engaged in prostitution and were addicted when he met them, that he did not prevent them from buying drugs elsewhere, and that one of the women moved in and out of his house freely.

5

Considering the evidence in the light most favorable to the Government, as we must, we conclude that it supports the jury's finding that Wysinger intended to use coercion. For example, victim M.J. testified that Wysinger and Garza exploited her as a prostitute. She lived in the house shared by Wysinger and Garza for about a year, performing commercial sex acts there and conducting "outcalls" elsewhere. During the same year, victim C.S.S. also lived in the house and worked as a prostitute for Wysinger.[2] M.J. testified that on their very first day in Wysinger's house, he gave the women heroin and then posted advertisements for them on a prostitution website because they "owed him money" for the heroin they had consumed. J.A. 177. The women performed, and the cycle continued. Wysinger and Garza told M.J. she was indebted to them for Wysinger driving her to outcalls and for drugs. Wysinger took "[p]retty much all" of the money M.J. made, J.A. 211, and supplied her with daily rations of drugs. M.J. testified that Wysinger got angry at her when she "owed him money and . . . didn't want to work" or "was dope sick and . . . felt like [she] couldn't go work." J.A. 184.

Victim S.F. also testified. At first, Wysinger gave S.F. drugs in exchange for sex. Once S.F. was receiving drugs from Wysinger every day, he required her to prostitute for him in Ocean City. S.F. testified that she only went with Wysinger because he threatened to stop supplying her drugs if she refused. Because Wysinger was her best source of supply, S.F. testified, she would experience withdrawal and be "deathly ill" if she did not submit to Wysinger's proposal. J.A. 566. Wysinger drove S.F. to Ocean City, posted

---

[2] C.S.S. was not available to testify because she died from an overdose of fentanyl supplied by Wysinger. Her death was the subject of Count 3.

6

advertisements for her online, and drove her to outcalls until they were arrested in an undercover law enforcement operation. S.F. testified that during this trip, Wysinger supplied her with drugs only as much as she prostituted for him. This testimony, and other consistent evidence, supports the jury's finding that Wysinger intended to coerce his victims into prostitution by exploiting their drug dependencies, even if he did not fully accomplish his scheme before his arrest.

Wysinger's arguments largely ask us to reweigh the facts, which we cannot do. *See United States v. Maynes*, 880 F.3d 110, 114 (4th Cir. 2018). For example, he claims that this case is not like *Mack* because the defendant there provided "free" drugs to his victims, only to later claim the drugs were not free and that the women owed a large debt. But whatever factual distinctions exist between this case and *Mack* make no difference. M.J. testified that Wysinger "fronted" her drugs and then posted her on a prostitution website to pay for them. J.A. 174–175. Although "fronting" drugs and falsely providing them for free may not be exactly the same, the underlying coercion is identical. Like the defendant in *Mack*, Wysinger intended to exploit the addictions of vulnerable women for his own profit by using seemingly easy access to drugs to create a cycle of debt and dependence. Wysinger also argues he cannot be guilty of using coercion because his victims purchased heroin from other dealers while involved with him. But that is not universally true. M.J., for example, retained almost none of her earnings and thus remained dependent on Wysinger. And even if some of Wysinger's victims were not dependent on him at all times, that would merely show that his plot did not always succeed. It would not absolve him of guilt for concocting and attempting the scheme.

7

As for Wysinger's repeated argument that he was not violent with the women, the statute plainly condemns "means of . . . coercion" separate from and in addition to "means of force [and] threats of force."  18 U.S.C. § 1591(a); *see Mack*, 808 F.3d at 1081–1082 (addressing the defendant's use of coercion and use of force separately).  Nor is physical violence necessary to establish coercion under the statute.  *See* 18 U.S.C. § 1591(e)(2) (defining "coercion"), (5) (defining "serious harm").  The evidence sufficed to support the jury's finding of coercion.

2.

Next, Wysinger argues that even if he harbored coercive intent, the evidence does not show that his alleged co-conspirator Garza shared his intent.  A basic requirement of the conspiracy offense is proof "that two or more people agreed to commit" the crime— here, sex trafficking by force, fraud, or coercion. *Smith v. United States*, 568 U.S. 106, 110 (2013).  If Garza lacked criminal intent, there could be no agreement to commit the crime.

Contrary to Wysinger's contention, a reasonable jury could conclude that Garza knew of and intended to participate in Wysinger's illegal scheme.  Garza—the mother of Wysinger's child—was not available to testify at trial because she died from a fentanyl overdose allegedly supplied by Wysinger.  Nevertheless, the evidence showed that she lived in the same house with Wysinger and some of his victims, who engaged in commercial sex there.  M.J. testified that she and C.S.S. worked for Wysinger seven days a week; he gave them only one day off all year, so that he, Garza, and the victims could watch football.  What is more, Garza herself posted advertisements for the victims on a prostitution website.  She knew that Wysinger was collecting the victims' money and

8

supplying them with drugs and that they had no cars or credit cards of their own. Indeed, when M.J. needed things from the store, Garza would drive her.

While this evidence may not compel the conclusion that Garza conspired with Wysinger, it suffices to support the jury's finding that Garza understood the nature of their undertaking and agreed to participate. As the jury was instructed (and Wysinger does not dispute), an agreement may be inferred from indirect and circumstantial evidence. A "'rational trier of fact,'" viewing the evidence and all inferences drawn therefrom in the light most favorable to the Government, "'could have agreed with the jury'" that Garza and Wysinger conspired to coerce the victims into prostitution. *Maynes*, 880 F.3d at 114 (quoting *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam)). We therefore cannot set aside the jury's verdict on this ground. *Id.*

B.

Wysinger also challenges the district court's instruction to the jury on the knowledge element of the Section 1591 offense. As he admits, Wysinger did not preserve this argument in the district court, so we review only for plain error. Under that standard, we will vacate the judgment if "(1) an error was made; (2) the error is plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Fall*, 955 F.3d 363, 373 (4th Cir. 2020) (internal quotation marks omitted). We find no error here.

Section 1591 punishes anyone who knowingly "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . *knowing, or, except where the act constituting the violation of paragraph (1) is*

9

*advertising, in reckless disregard of the fact*, that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a) (emphasis added). Wysinger contends the jury had to find that he acted knowing coercion would be used, not merely in reckless disregard of that fact, because the Government charged him with advertising under Section 1591. The jury instruction for Count 1 was erroneous, he argues, because it allowed the jury to convict him upon finding that he acted with the less culpable mental state of recklessness.

Wysinger is incorrect. The indictment charged him with conspiring "to recruit, entice, harbor, transport, provide, obtain, and maintain" the victims, and the jury was so instructed. J.A. 20, 1133. The charge did not include advertising, which would have required that he act with knowledge that coercion would be used. The indictment and instructions mentioned the word "advertising" in one of five overt acts alleged to support the charge, using the term to describe the website where Wysinger solicited customers to engage in sex acts with his victims, not to describe the charge's statutory basis. Consistent with the indictment, the instructions did not authorize the jury to convict Wysinger on Count 1 by finding that he conspired to advertise the victims. The district court therefore correctly instructed the jury that it could convict Wysinger on Count 1 upon finding that he acted with knowledge or reckless disregard of the fact that coercion would be used to cause the victims to engage in commercial sex acts.

10

II.

Wysinger next challenges his convictions on Counts 3 and 4 for distributing, or possessing with intent to distribute, fentanyl resulting in serious bodily injury or death. *See* 21 U.S.C. § 841(a)(1), (b)(1)(C). Specifically, Wysinger argues the jury instructions for Counts 3 and 4 were duplicitous and incompatible with the statute.

We may quickly dispense with the duplicity argument, which in truth stems from the indictment rather than the jury instructions. Wysinger complains that Counts 3 and 4 each charged both distribution of fentanyl and possession with intent to distribute fentanyl, which he claims is duplicitous. The jury instructions accurately reflected the indictment. Federal Rule of Criminal Procedure 12(b)(3)(B)(i) requires a defendant to raise a duplicity objection to the indictment before trial, which Wysinger failed to do. And although a court may consider an untimely duplicity objection upon a showing of "good cause," Fed. R. Crim. P. 12(c)(3), Wysinger has not attempted to make such a showing. We therefore decline to address his forfeited argument. *See United States v. King*, 628 F.3d 693, 699 (4th Cir. 2011).

As for the statutory elements, we review de novo Wysinger's claim that the jury instructions incorrectly stated the law. *See United States v. Mouzone*, 687 F.3d 207, 217 (4th Cir. 2012). Section 841 makes it unlawful to "knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," and imposes an increased penalty "if death or serious bodily injury results from the use of such substance." 21 U.S.C. § 841(a)(1), (b)(1)(C). The district court instructed the jury as follows:

For you to find the defendant guilty, the government must prove each of the following beyond a reasonable doubt:

First, that the defendant distributed a controlled substance, namely, fentanyl;

Second, that the defendant knew that the substance distributed was a controlled substance under the law at the time of the distribution, and;

Third, that the defendant did so knowingly or intentionally.

Or: First, that the defendant possessed a detectable amount of controlled substance alleged in the indictment;

Second, that the defendant knew that the substance possessed was a controlled substance under the law at the time of the possession; and

Third, that the defendant did so with the intent to distribute the controlled substance.

On each of these two counts, Count 3 and Count 4, if you find beyond a reasonable doubt that the government has established each of these elements, then you must determine whether death or serious bodily injury resulted from the use of the controlled substance by the alleged individual. This standard is satisfied if you find beyond a reasonable doubt that but for the individual ingesting the fentanyl, the individual would not have suffered a serious bodily injury or died.

J.A. 1144–1145. Wysinger claims that this instruction misapplied the statute because it allowed the jury to convict on a finding of possession with intent to distribute, even if Wysinger did not distribute fentanyl to the victims. According to Wysinger, Section 841's increased penalty when death or serious bodily injury results can apply only to defendants who actually distribute the drug to the victim.

Wysinger misreads the statute. Its enhanced penalty applies not when the prohibited conduct listed in Section 841(a)(1) results in death or injury but when "death or serious bodily injury results from *the use of* such substance." 21 U.S.C. § 841(b)(1)(C) (emphasis

12

added); *see United States v. Jeffries*, 958 F.3d 517, 524 (6th Cir. 2020).  Properly read, the crime has two "principal elements": (1) conduct prohibited by Section 841(a)(1), and (2) "death caused by ('resulting from') the use of that drug."  *Burrage v. United States*, 571 U.S. 204, 210 (2014) (citing 21 U.S.C. § 841(b)(1)(C)).  Nothing in the statute requires a jury to find that the defendant actually delivered the drug to the victim in order for the increased penalty to apply.  *Cf. United States v. Alvarado*, 816 F.3d 242, 249 (4th Cir. 2016) (reaffirming after *Burrage* that Section 841(b)(1)(C) "'imposes no reasonable foreseeability requirement'" (quoting *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994))).  Nor do Wysinger's authorities say anything of the sort.  In each case, the crime charged happened to be distribution, but the court made no suggestion that the other conduct prohibited by the statute could not support a Section 841(b)(1)(C) conviction.  Finding no error in the jury instruction, we affirm Wysinger's convictions on Counts 3 and 4.

### III.

Wysinger's convictions on Counts 3 and 4 subjected him to mandatory life sentences because the district court found that he had "a prior conviction for a felony drug offense."  21 U.S.C. § 841(b)(1)(C).  We review Wysinger's challenge to this sentencing enhancement for plain error because he did not preserve an objection to the enhancement in the district court, and he certainly did not preserve the argument he now presses on appeal.  Under that standard, we will vacate the enhancement if (1) the district court erred by characterizing Wysinger's prior conviction as a "felony drug offense," (2) the error is plain, (3) the error affected his substantial rights, and (4) leaving the error uncorrected

13

would seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See Fall*, 955 F.3d at 373.

A "felony drug offense" is "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44). The parties rightly agree that this definition requires us to apply a categorical approach that compares the elements of the defendant's prior offense with the criteria specified in Section 802(44). *See United States v. Ruth*, 966 F.3d 642, 647 (7th Cir. 2020) ("The conduct-based categorical approach applies here to § 841(b)(1)(C)'s sentencing enhancement."); *cf. Shular v. United States*, 140 S. Ct. 779, 782–783 (2020) (contrasting a "generic offense" categorical methodology with a criterion-based method). The parties differ, however, on the meaning of "narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances" in the statute. Specifically, they disagree about whether we should look to federal law or state law to define those terms when assessing a prior state conviction.

We find the answer in the statute's text. Section 802 provides highly detailed definitions of the terms "narcotic drug," 21 U.S.C. § 802(17), "marihuana," *id.* § 802(16), "anabolic steroid," *id.* § 802(41), and "depressant or stimulant substance," *id.* § 802(9)— the exact terms used in the "felony drug offense" definition in Section 802(44). Congress's use of these defined terms in Section 802(44) strongly suggests that it intended those definitions to control. *See Burgess v. United States*, 553 U.S. 124, 129 (2008) ("Statutory definitions control the meaning of statutory words in the usual case." (internal quotation

14

marks and ellipsis omitted)); *see*, *e.g.*, *United States v. Aviles*, 938 F.3d 503, 511 (3d Cir. 2019) (incorporating these definitions into Section 802(44)).  Put another way, we doubt Congress meant for us to ignore the detailed definitions it provided for these precise terms in the same statutory section and instead search state codes to ascertain if and how the States define those terms.[3]

The parties miss the mark with arguments that turn on the meaning of "controlled substance," a term that appears nowhere in the definition of "felony drug offense." Wysinger would have us incorporate the federal drug schedules, *see* 21 U.S.C. § 812, which define a "controlled substance" under federal law, *see id.* § 802(6).  But we see no reason to substitute a term Congress did not use for the words it actually did.

The Government, for its part, argues that our decision in *United States v. Ward*, 972 F.3d 364 (4th Cir. 2020), compels us to define the drug categories in Section 802(44) by reference to state law.  But in *Ward*, we interpreted the Sentencing Guidelines' career-offender enhancement, which in relevant part defines a "controlled substance offense" as "an offense under federal or state law . . . that prohibits [certain conduct with respect to] *a controlled substance*."  U.S.S.G. § 4B1.2(b) (emphasis added).  As we explained, a "controlled substance" is "any type of drug . . . regulated by law," and the text of the Guideline made clear that *state* regulation of the drug sufficed.  *Ward*, 972 F.3d at 371–372 (internal quotation marks and emphases omitted).  Section 802(44), however, does not

---

[3] For example, a glance at the Virginia Code reveals no definition for any variation of "depressant" or "stimulant," much less the combined term "depressant or stimulant substance."

refer to "controlled substances" but instead restricts the universe of relevant regulated drugs to four categories: "narcotic drugs, marihuana, anabolic steroids, [and] depressant or stimulant substances." Although the Government urges us to consult state law, it does not identify any state law actually defining these categories to guide our inquiry. Yet Congress precisely defined these terms in the same statutory section. We will apply those definitions.

Having ascertained the criteria of a "felony drug offense" in Section 802(44), we must compare the elements of Wysinger's prior offense with those criteria to determine whether the two categorically match. *See Cucalon v. Barr*, 958 F.3d 245, 250 (4th Cir. 2020) (explaining the categorical approach). The Government relies on Wysinger's prior conviction for violating Virginia Code § 18.2-248.[4] We have held that Section 18.2-248 is divisible by prohibited substance, *Cucalon*, 958 F.3d at 253; therefore, we may consult certain records from Wysinger's state court case to understand which specific offense formed the basis of his conviction, *see Shepard v. United States*, 544 U.S. 13, 16–17 (2005) (explaining acceptable documents). Those documents do not reveal the exact substance Wysinger possessed, but they do establish that he pled guilty to "knowingly and intentionally manufactur[ing], sell[ing], giv[ing], distribut[ing] or possess[ing] with intent to manufacture, sell, give or distribute a Schedule I or II controlled substance, without authority." J.A. 1428.

---

[4] In the district court, the Government also relied on a prior Maryland conviction. On appeal, the Government concedes that the documentation it submitted to the district court fell short of establishing that conviction, so we do not consider it.

16

Wysinger does not contest that his Virginia offense was "punishable by imprisonment for more than one year." 21 U.S.C. § 802(44). Rightly so. Section 18.2-248 provides that a person who violates that section "with respect to a controlled substance classified in Schedule I or II" shall be "imprisoned for not less than five" years. Va. Code Ann. § 18.2-248(C) (2005).

Wysinger does contest whether his Virginia offense was under a state law "that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44). The question is whether Virginia's Schedules I and II—which were the basis for Wysinger's conviction—penalize conduct with respect to any substances that are not "narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances" as defined in Section 802. *See id.* § 802(9), (16), (17), (41). If they do, the state statute is not a categorical match for this "felony drug offense" criterion.

When Wysinger was convicted, Virginia Schedule I, broadly speaking, included opiates, opium derivatives, certain hallucinogenic substances, certain depressants, and certain stimulants. Va. Code Ann. § 54.1-3446 (2005). Virginia Schedule II, again broadly speaking, included opium and opiates, cocaine, certain stimulants, certain depressants, a hallucinogenic substance, and certain substances that "are immediate precursors to amphetamine and methamphetamine or phencyclidine." Va. Code Ann. § 54.1-3448 (2005). Exhaustively comparing these detailed schedules to the Section 802 definitions of "narcotic drugs," "marihuana," "anabolic steroid," and "depressant or stimulant substance" would be a job for a pharmaceutical chemist, but we need not do so because we review

17

only the arguments Wysinger has presented and only to the extent necessary under the plain error standard of review.

Wysinger first argues that we found Section 18.2-248 overbroad in *Cucalon* and that conclusion applies here. In *Cucalon*, however, we compared all the Virginia controlled substance schedules to all the federal schedules and concluded that the Virginia schedules include "at least one substance not listed on the federal schedules." 958 F.3d at 251. But that is not our inquiry here. Rather, we are comparing Virginia Schedules I and II with the Section 802 definitions of "narcotic drug," "marihuana," "anabolic steroid," and "depressant or stimulant substance." 21 U.S.C. § 802(9), (16), (17), (41). So *Cucalon* does not control.

Second, Wysinger zeroes in on purported variations between federal and Virginia law concerning isomers of cocaine.[5] Virginia's Schedule II includes "cocaine or *any* salt or isomer thereof." Va. Code Ann. § 54.1-3448(1) (2005) (emphasis added). Meanwhile, Section 802(17)'s definition of "narcotic drug" includes "[c]ocaine, its salts, *optical and geometric isomers*, and salts of isomers." 21 U.S.C. § 802(17)(D) (emphasis added). Wysinger contends that Virginia's definition includes positional isomers of cocaine while the federal definition does not, making the Virginia schedule fatally overbroad.

This argument falls significantly short of establishing plain error, as any mismatch between the state and federal definitions is far from obvious. *See United States v. Lester*,

---

[5] In his reply brief, Wysinger also mentions Virginia law regarding isomers of heroin, but he does not identify which Section 802 definition we should compare to Virginia's definition of heroin. We therefore need not consider this belated argument.

985 F.3d 377, 387 (4th Cir. 2021) ("An error is 'plain' if it is 'clear or obvious, rather than subject to reasonable dispute.'" (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009))). Even assuming that positional isomers of cocaine exist in the drug trade—a debatable proposition—Wysinger offers no support for reading "any . . . isomer" in Virginia law to include positional isomers of cocaine.[6] The only reference to positional isomers in Schedule I or II is in reference to certain hallucinogenic substances. *See* Va. Code § 54.1-3446(3); *cf.* 21 U.S.C. § 802(14) (including positional isomers only in reference to hallucinogenics). Moreover, even if Virginia law did criminalize positional isomers of cocaine, Wysinger has not answered the Government's contention that those isomers may nevertheless qualify as a "narcotic" or "stimulant" within other parts of the federal definitions. In sum, Wysinger's speculation about positional isomers of cocaine fails to show that the district court plainly erred in not finding overbreadth on this ground. We therefore affirm the district court's determination that Wysinger's Virginia conviction was for a "felony drug offense" that supports application of the Section 841(b)(1)(C) sentencing enhancement.

## IV.

Finally, Wysinger contests application of the career-offender sentencing enhancement. *See* U.S.S.G. § 4B1.1. We need not address the merits of his argument because, even assuming error, the enhancement had no effect on his sentence.

---

[6] This distinguishes the case on which Wysinger primarily relies, *United States v. Ruth*, 966 F.3d 642, 648 (7th Cir. 2020). The Illinois statute at issue there specifically defined "cocaine" as including its "optical, positional and geometric isomers." *Id.* at 647 (internal quotation marks omitted).

"A sentencing error is harmless if the resulting sentence was not longer than that to which the defendant would otherwise be subject." *See United States v. Hargrove*, 701 F.3d 156, 161 (4th Cir. 2012) (internal quotation marks and brackets omitted). In performing harmless-error review, we may "assume that a sentencing error occurred and proceed to examine whether the error affected the sentence imposed." *Id.*

There is no doubt that the district court would have sentenced Wysinger to life imprisonment even without the career-offender enhancement and that such a sentence would be reasonable. *See id.* at 162. As previously discussed, Wysinger's convictions on Counts 3 and 4 subjected him to statutorily required life sentences. And his Guidelines sentence, even without the career-offender designation, was imprisonment for life. Any error in applying the career-offender enhancement was harmless.

*AFFIRMED*