# United States Court of Appeals
## For the First Circuit

No. 23-1859

UNITED STATES,

Appellee,

v.

ANTONIO CASILLAS-MONTERO, a/k/a Stone City Kennel,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Silvia L. Carreño-Coll, U.S. District Judge]

Before

Gelpí, Lipez, and Rikelman,
Circuit Judges.

Linda A. Backiel for appellant.

Thekla Hansen-Young, with whom W. Stephen Muldrow, United States Attorney, Jonathan L. Gottfried, Assistant United States Attorney, Todd Kim, Assistant Attorney General, Rachel Heron, Ethan C. Eddy, and Allen M. Brabender, Environment and Natural Resources Division, U.S. Department of Justice, were on brief, for appellee.

September 16, 2025

**GELPÍ, Circuit Judge.** Defendant-Appellant Antonio Casillas Montero ("Casillas") -- a "legend" in the dogfighting world -- pleaded guilty to three counts under the Animal Welfare Act ("AWA"): one count for conspiracy to violate the Animal Welfare Act and two counts for possession of dogs for use in an animal fighting venture. The Presentence Investigation Report ("PSR") calculated the Sentencing Guidelines Range ("GSR") as 12 to 18 months, but it noted that Casillas's conduct could justify both an upward departure under the relevant guideline and an upwardly variant sentence. Citing a medley of factors, the district court imposed on Casillas an 84-month term of imprisonment: 36 months on the conspiracy count, and 24 months on each of the possession counts, all to be served consecutively.

On appeal, Casillas levels a broadside attack on his sentence. He starts with the adequacy of the sentence's explanation, claiming that the district court's stated reasons were inadequate, improper, or both. He then argues that the district court's imposition of consecutive sentences violated the Double Jeopardy Clause of the Fifth Amendment to the Constitution. Finally, he insists that the sentence was substantively unreasonable because similarly situated defendants received lesser sentences. For the reasons explained below, we **affirm**.

- 2 -

# I. BACKGROUND[1]

The facts of this case, while heinous, are relatively straightforward. For 35 years, Casillas operated Stone City Kennel, where he and at least one co-conspirator bred and trained dogs for dogfighting in the United States and abroad. Known to some as a "legend" in the dogfighting world, Casillas was extensively involved in dogfighting through Stone City Kennel. He trained as many as 40 dogs at a time, employing grueling techniques to enhance the dogs' fighting capabilities;[2] sold dogs for thousands of dollars to international clientele; mentored others involved in dogfighting; promoted dogfighting events; and participated in over 150 dogfights across the Americas and the Caribbean, including several U.S. states, Puerto Rico, the Dominican Republic, Mexico, Ecuador, and Peru. None of those facts are disputed.

On October 6, 2022 -- days after Casillas had admitted incriminating information to an undercover federal agent -- a grand jury sitting in the District of Puerto Rico indicted him for

---

[1] "This appeal arises following a guilty plea, so we draw the facts from the undisputed sections of the presentence investigation report ('PSR') and the transcripts of the change-of-plea and sentencing hearings." United States v. Burgos, 133 F.4th 183, 187 n.1 (1st Cir. 2025) (citation modified).

[2] His training techniques included chaining the dogs to treadmills to walk or run for long distances; giving the dogs steroids and hormones; and holding test fights between dogs at his residence in Humacao, Puerto Rico.

conspiracy to violate the AWA in violation of 7 U.S.C. § 2156 and 18 U.S.C. § 49.  Casillas was arrested that same day.  Following the arrest, the government searched Casillas's property and found, among other things, four dogs living in poor conditions and suffering from a litany of health problems.[3]  Those findings gave rise to the November 2022 superseding indictment, which restated the conspiracy count and tacked on four more counts for possession of dogs for use in an animal fighting venture in violation of 7 U.S.C. § 2156(b) and 18 U.S.C. § 49.  (In other words, the superseding indictment charged Casillas with one possession count for each dog found on his property during the October 2022 search.)  In May 2023, Casillas pleaded guilty to the conspiracy count and two possession counts.  The plea agreement did not include an agreed-upon guidelines calculation.

In due course, the Probation Office prepared the PSR.  After recounting the offense conduct in detail, the PSR grouped together the three offenses, calculated a total offense level of 13 and a criminal history category of I, and set the GSR at 12 to 18 months.

Toward the end of the PSR, the Probation Office also included reasons why the district court could both upwardly depart

---

[3] The PSR recites in some detail the grim picture of the four dogs on Casillas's property.  All we need to say here is that the dogs were found to have various bacterial and fungal infections, parasites, and lesions.  They have all fully recovered.

from the relevant guideline and impose an upwardly variant sentence based on the statutory sentencing factors. First, the PSR cited Application Note 2 to section 2E3.1 of the U.S. Sentencing Guidelines,[4] remarking that it permits an upward departure where the offense involves "animal fighting on an exceptional scale." Second, the PSR indicated that the district court could exercise its discretion to impose an upwardly variant sentence after considering the sentencing factors set forth in 18 U.S.C. § 3553(a). The PSR then listed Casillas's relevant conduct for the district court to consider in either departing or upwardly varying. In particular, the PSR pointed to Casillas's participation in more than 150 dogfights over the course of 35 years; the international reach of his dogfighting operation; his

---

[4] Application Note 2 provides in full:

> The base offense levels provided for animal fighting ventures in subsection (a)(1) and (a)(3) reflect that an animal fighting venture involves one or more violent fights between animals and that a defeated animal often is severely injured in the fight, dies as a result of the fight, or is killed afterward. Nonetheless, there may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense. In such a case, an upward departure may be warranted. For example, an upward departure may be warranted if (A) the offense involved extraordinary cruelty to an animal beyond the violence inherent in such a venture (such as by killing in a way that prolongs the suffering of the animal); or (B) the offense involved animal fighting on an exceptional scale (such as an offense involving an unusually large number of animals).

U.S.S.G. § 2E3.1, app. n. 2.

promotion of fights; and his practice of letting dogs die -- rather than removing them and tending to their injuries -- if the dogs were losing during the course of a fight.

Both parties then filed their respective sentencing memoranda. For his part, Casillas advocated for a sentence between 18 and 24 months, emphasizing his personal background and Puerto Rico's tradition of animal fighting as mitigating factors but acknowledging that Application Note 2 might warrant an upward departure. The government disagreed with Casillas's calculation. It sought a 120-month sentence, arguing that either an upward departure or a variance was justified by the magnitude of Casillas's conduct and the section 3553(a) considerations.

The district court held a sentencing hearing in September 2023. The government called two agents to testify as experts: one as an expert in forensic digital evidence, and the other as an expert on dogfighting. The forensic digital expert confirmed that he had extracted incriminating information from Casillas's cell phone. And, more relevant for purposes of this appeal, the dogfighting expert -- who had conducted over 60 dogfighting investigations in nine years -- testified with particularity about Casillas's unprecedented involvement with dogfighting. On that score, the dogfighting expert described Casillas's dogfighting operation as "by far . . . the longest . . . and probably the farthest-reaching" he had seen in

his career.  He explained, too, that he had never had a case in which the dogfighter participated in more than 150 matches, nor had he ever seen an event the size of the one Casillas hosted in the Dominican Republic.  Moreover, the dogfighting expert remarked that Casillas's practice of letting losing dogs die during or after fights was "very uncommon."[5]

The parties then argued their respective positions.  The government started by citing other dogfighting cases in which defendants received sentences above the GSR for conduct that, the government represented, was less severe than Casillas's.  It then turned to Casillas's extensive dogfighting history and his roles as dog trainer, dogfighter, organizer, and mentor.  The government argued that those case-specific facts along with a heightened need for deterrence in Puerto Rico warranted an upwardly variant sentence of 120 months' imprisonment.

Casillas responded by attempting to distinguish his case from those cited by the government.  He asserted that the government's cases often involved additional crimes unrelated to dogfighting.  Moreover, Casillas said that the items found during the search of his property indicated that he was winding down his operations.  Next, Casillas sought to undermine the government's

---

[5] Notably, the government presented to the district court a video showing one of Casillas's dogs slowly dying from blood loss due to injuries suffered during a dogfight.

deterrence argument by noting that statistics from drug cases demonstrate that high sentences do not actually deter others from committing crimes. Finally, Casillas turned to the 18 U.S.C. § 3553(a) factors, highlighting Casillas's "personal factors" and arguing that they "outweigh[ed] the negativity of" his offending conduct.

After having heard the experts' testimony and the parties' arguments, the district court rendered its sentence. It began by taking note of the relevant charges and sentencing guideline and determining that the PSR had accurately "applied the correct guideline computations." The district court then addressed Casillas's personal characteristics, including his age, education, professional qualifications, medical conditions, and criminal history.

Turning to the offense conduct, the district court highlighted the exceptional scale of Casillas's dogfighting venture. It pointed to Casillas's admitted participation in over 150 dogfights, his enterprise's international reach, and his status "as a Caribbean legend and a sought[-]after teacher and mentor" in the dogfighting world. The district court also referenced "[t]he evidence presented during the [sentencing] hearing," which "showed examples of extreme cruelty." In particular, the district court cited Casillas's penchant for letting dogs who lost a dogfight die instead of removing them from

the fight.  "In 2018," the district court noted, "[Casillas] explained during a Facebook conversation that his dog lost due to a nosebleed that never stopped, and he did not stop the fight but instead le[t] the dog bleed out and die."  The district court recalled, too, a video presented to it, which showed Casillas's "dog breathing in agony[, which] later died from the injuries he sustained during [the dog]fight."  Casillas, the district court remarked, made "no attempt to alleviate [the dog's] suffering." And the district court considered Casillas's advertising dogfighting events and the expert testimony that the 24-match event hosted by Casillas "[wa]s unprecedented in [the expert's] experience."

The district court next explicitly invoked "the Title 18 U.S. Code, Section 3553 sentencing factors," including "the need to promote . . . respect for the law, protect the public from further crimes by the defendant, as well as address the issues of deterrence and punishment."  After doing so, the district court mentioned Application Note 2 to section 2E3.1.  It noted that the guideline accounted for the violent nature of animal fighting ventures, but that its departure provision recognizes "there may be cases in which the offense level determined under [section 2E3.1] substantially understates the seriousness of the offense." Perhaps contemplating that guideline, the district court found

that "the number of fights and the duration of . . . Casillas's involvement [wa]s extraordinary in nature."

The district court, however, then reiterated a question from Casillas's sentencing memorandum: "How much of a departure is sufficient but not greater than necessary to comply with the statutory directive set forth in Title 18 U.S.C. § 3553(a)?"  The district court responded, "In answering that question, the Court would like to begin by stating that the facts of this case are extreme.  As such, the guidelines do not properly reflect the seriousness of the offenses committed by Mr. Casillas."  So, ostensibly incorporating by reference the policy disagreement of another district judge, the district court said:

> Just as a sentencing judge expressed in [United States v. Hargrove, 701 F.3d 156 (4th Cir. 2012)], other than the criminal dogfighters in America, every other person in America would be shocked beyond belief that [one] can do what [Casillas] did and come out with a federal sentence of 12 to 18 months.[6]

The district court then reiterated much of Casillas's offense conduct.  At its penultimate step before pronouncing the

---

[6] The statement with which the district court expressed its agreement is as follows:

> I would say that other than the criminal dog fighters in America, every other person in America would be shocked beyond belief that you could do what [Hargrove] did and come out with a federal sentence of zero to six months . . . .  No one could defend that.  No judges.  No legislators.  No president.

Hargrove, 701 F.3d at 159-60.

sentence, the district court stated, "The fact that a varian[t] sentence deviates significantly from the advisory guideline range does not alone render it presumptively unreasonable." Finally, the district court considered the cases cited by the government in support of its proposed 120-month sentence. At Casillas's suggestion, the district court agreed that the government's comparator cases were distinguishable because those "had a drug and/or gun nexus." Holding that "the nexus [wa]s not present in this case," the district court took that "distinction into consideration."

The district court ultimately fashioned a total sentence of 84 months: 36 months on the conspiracy count and 24 months on each of the two possession counts, all to be served consecutively. The district court stated that the consecutive sentences were "just and not greater than necessary after considering all of the sentencing factors and [wa]s supported by the undisputed facts presented" at the sentencing hearing.

When all was said and done, the district court asked defense counsel whether he had "[a]ny specific requests." Defense counsel requested only that the district court recommend to the Bureau of Prisons that Casillas "be designated for an institution within the southern part of the United States, Florida, so that his family would be closer to him." The district court consented and then asked whether defense counsel had "[a]ny other request,"

to which defense counsel responded, "No, ma'am." The sentencing hearing concluded at 7:45 p.m.

In its "Statement of Reasons," the district court described the sentence as an upward variance -- not an upward departure. It indicated that the sentence was based on the section 3553(a) factors. As justifications for the upward variance, the district court specifically marked (1) "[t]he nature and circumstances of the offense"; (2) Casillas's "history and characteristics"; (3) "[t]o reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (4) "[t]o afford adequate deterrence to criminal conduct"; and (5) "[t]o protect the public from [Casillas's] further crimes." Beyond checking those boxes, the district court further explained the basis for the variance by reciting, almost verbatim, the justifications it had given during the sentencing hearing -- namely, Casillas's extensive and extremely cruel conduct and Casillas's personal history and characteristics. That more-detailed statement also repeated the district court's mention of Application Note 2 to section 2E3.1 and its agreement with the sentencing judge in Hargrove.

Casillas timely appealed.

## II. DISCUSSION

Casillas raises three principal challenges on appeal. He generally asserts (and not in this order) that the district

- 12 -

court erred by (1) imposing three consecutive sentences for only one actual offense and thus violating the Fifth Amendment's Double Jeopardy Clause; (2) failing to adequately explain the sentence; and (3) imposing a substantively unreasonable sentence. We address each argument, starting with the constitutional questions.

## A. Double Jeopardy

Casillas contends that the consecutive sentences violated double jeopardy principles in two ways. First, he points to the conspiracy count, arguing that because it encompassed the same conduct underlying the two possession counts, the imposition of consecutive sentences for each count resulted in double punishment. Second, he asserts that consecutive sentences for the two possession counts are multiplicitous, i.e., they impermissibly punish him twice under the same statute and for the same conduct.

We see no merit in Casillas's double jeopardy contentions. The Double Jeopardy Clause states that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. In the sentencing context, this constitutional guarantee "bars a sentencing court from imposing multiple punishments for the same offense." United States v. Grant, 114 F.3d 323, 328 (1st Cir. 1997).

As mentioned above, Casillas first argues that consecutive sentences on the conspiracy and possession counts violated double jeopardy principles because the conspiracy count

encompassed the acts underlying the possession counts. Casillas is wrong. The Supreme Court has explained that "a substantive crime, and a conspiracy to commit that crime, are not the 'same offense' for double jeopardy purposes." United States v. Flores-Rivera, 56 F.3d 319, 327 n.5 (1st Cir. 1995) (quoting United States v. Félix, 503 U.S. 378, 389 (1992)). That rationale applies even if the conspiracy "was based on the same underlying incidents, because the 'essence' of a conspiracy offense 'is in the agreement or confederation to commit a crime.'" Félix, 503 U.S. at 389-90 (quoting United States v. Bayer, 331 U.S. 532, 542 (1947)).

That rule finds ready application here: even though Casillas's October 2022 possession of two different dogs for dogfighting purposes were overt acts included in the conspiracy charge, the possession and the conspiracy "[we]re separate and distinct offenses." Id. at 390 (quoting Pinkerton v. United States, 328 U.S. 640, 643 (1946)). We thus discern no double jeopardy violation for Casillas's consecutive punishment for the conspiracy and possession offenses.

Casillas's second argument -- that the two dog possession counts are multiplicitous -- fares no better. The dog possession counts both charged Casillas under 7 U.S.C. § 2156(b) and 18 U.S.C. § 49 with contemporaneous possession of two different dogs found at his property for use in an animal fighting venture. Casillas argues that the two charges "impose multiple punishments

- 14 -

for what is essentially the same offense."  See United States v. Medina-Villegas, 700 F.3d 580, 585 (1st Cir. 2012).

"In general terms, when 'a claim of multiplicity is premised on an indictment alleging several violations of a single statutory provision, an inquiring court must determine whether there is a sufficient factual basis to treat each count as separate.'"  United States v. Gordon, 875 F.3d 26, 32 (1st Cir. 2017) (quoting United States v. Stefanidakis, 678 F.3d 96, 100-01 (1st Cir. 2012)).  But where, as here, a defendant challenges the constitutionality of consecutive sentences imposed for charges to which he plead guilty, he "must show that the indictment was facially multiplicitous to prevail." Grant, 114 F.3d at 329.  And if the allegedly duplicative charges arise from the same transaction, we must determine "whether Congress intended to punish separately each of the alleged violations." Gordon, 875 F.3d at 32; see also Jeffers v. United States, 432 U.S. 137, 155 (1977) ("The critical inquiry is whether Congress intended to punish each statutory violation separately.").

Our inquiry centers on "[w]hat Congress has made the allowable unit of prosecution" under § 2156(b).  Bell v. United States, 349 U.S. 81, 81 (1955) (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221 (1952)).  In conducting this task, we keep in mind that Congress "has no difficulty in expressing" its "will . . . of defining what it desires to make

- 15 -

the unit of prosecution." United States v. Armenteros-Chervoni, 133 F.4th 8, 18 (1st Cir. 2025) (quoting Bell, 349 U.S. at 83). Thus, "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses." Id. (quoting Bell, 349 U.S. at 84). This is "a question of statutory interpretation, [so] our review is de novo." United States v. Smith, 919 F.3d 1, 15 (1st Cir. 2019) (citation omitted).

"In ascertaining congressional intent, we employ 'the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute.'" Gordon, 875 F.3d at 33 (quoting McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 423 (1st Cir. 2007)). We, of course, begin with the text, and where "Congress chose words that it did not define, we assume those words 'carry their plain and ordinary meaning.'" Id. (quoting Stornawaye Fin. Corp. v. Hill, 562 F.3d 29, 32 (1st Cir. 2009)).

Here, the statutory text is quite clear about the unit of prosecution.[7] Section 2156(b) provides that "[i]t shall be

_____

[7] Casillas relied on Courtland to argue that other similarly situated defendants did not face higher sentences due to the quantity of dogs in possession. However, the circumstances in Courtland are inapposite to those in Casillas because the defendants in Courtland did not plead to a possession count or only pleaded to one possession count each, unlike Casillas who agreed to plead to multiple possession counts. See United States v. Courtland, 642 F. 3d 545, 547 (7th Cir. 2011) (explaining that

- 16 -

unlawful for any person to knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture."  7 U.S.C. § 2156(b).  The provision's use of the definite article "the" in the clause "for purposes of having the animal participate in an animal fighting venture," id. (emphasis added), suggests Congress's intent to designate as the unit of prosecution each individual animal, rather than the actions of selling, buying, training, transporting, delivering, or receiving any number of animals.

To be sure, Congress's use of the singular is not dispositive on the question before us.  After all, the Dictionary Act instructs courts interpreting statutes that "words importing the singular include and apply to several persons, parties, or things," "unless the context indicate otherwise."  1 U.S.C. § 1; cf. 289 Kilvert, LLC v. SBC Tower Holdings LLC, 133 F.4th 1, 5 (1st Cir. 2025) ("[W]e do not interpret a statute's text 'in a vacuum'; we read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting Sturgeon v. Frost, 577 U.S. 424, 438 (2016))).  Yet the context supports the government's reading.  For instance, other sections of the

---

each defendant pleaded guilty to a conspiracy count); see also United States v. Richardson, 796 F. App'x 795, 796-97 (4th Cir. 2019) (explaining the charges each defendant pleaded guilty to).

- 17 -

same statute employ the singular. See, e.g., 7 U.S.C. § 2156(a)(1) (prohibiting "knowingly sponsor[ing] or exhibit[ing] an animal in an animal fighting venture" (emphases added)); see also id. § 2156(c) (prohibiting certain conduct "for purposes of advertising an animal . . . [or] furthering an animal fighting venture" (emphases added)). And Congress moreover made clear its intent in Section 2131, its "statement of policy." See Bittner v. United States, 598 U.S. 85, 98 n.6 (2023) ("A preamble, purpose clause, or recital is a permissible indicator of meaning." (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 217 (2012))). Section 2131 states in relevant part:

> The Congress finds . . . that regulation of animals and activities as provided in this chapter is necessary . . . in order--
>
> (1) to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment; and
>
> (2) to assure the humane treatment of animals during transportation in commerce. . . .

That proclamation evinces Congress's central aim: the humane care and treatment of animals. As the government points out, each animal experiences suffering individually, so prosecuting separately each instance of possession of a dog for dogfighting purposes hews closely to the statute's text, including its explicit purpose.

- 18 -

Casillas ignores these text-based indicators.[8]  In fact, he scarcely mentions the statutory text.  And although he quotes part of section 2156(b), he omits the latter clause -- "for purposes of having the animal participate in an animal fighting venture."  Instead, relying on our decision in United States v. Rodriguez, 525 F.3d 85 (1st Cir. 2008), and the Supreme Court's decision in Bell v. United States, 349 U.S. 81 (1955), Casillas offers an alternative unit of prosecution under section 2156(b): the action.  In his view, section 2156(b) criminalizes the act of selling, buying, training, transporting, delivering, or receiving any number of animals.

As we have already explained, the government's interpretation faithfully adheres to the text and express purpose of the statute.  Casillas's incomplete text-based argument does not move the needle.  Nor does his invocation of our decision in Rodriguez or the Supreme Court's decision in Bell.

Take Rodriguez.  525 F.3d 85.  There, we analyzed a defendant's two convictions under 18 U.S.C. § 924(c).  Id. at 111.  Both convictions arose from the possession of a gun in relation to the same drug conspiracy; the only difference between the two counts was that one possession occurred nine days before the other

---

[8] Casillas adds some new arguments to his reply brief.  But it is well-settled in our circuit that we do not consider arguments raised for the first time in a reply brief.  SEC v. Navellier & Assocs., Inc., 108 F.4th 19, 35 n.9 (1st Cir. 2024).

- 19 -

conviction.  Id.  Reiterating our earlier decision in United States v. Pena-Lora, 225 F.3d 17, 32 (1st Cir. 2002), we vacated the consecutive sentences.  Rodriguez, 525 F.3d at 111-12.  Our decision was based on our determination that the section 924(c) convictions were "principally" meant as "sentencing-enhancement mechanism[s] for application to persons convicted of underlying crimes of violence."  Pena-Lora, 225 F.3d at 32.  Because those two convictions arose out of one predicate offense, and because the 924(c) convictions stacked consecutive punishment on top of the punishment received for the one predicate offense, we held that stacking those sentences "would impinge upon fundamental 'double jeopardy' principles."  Rodriguez, 525 F.3d at 111 (quoting Pena-Lora, 225 F.3d at 32).

But that decision carries no weight here.  Unlike the defendant in Rodriguez, Casillas pleaded guilty to independent possession offenses for each dog he possessed, effectively "conced[ing] that he ha[d] committed . . . separate offenses." Grant, 114 F.3d at 329 (quoting United States v. Broce, 488 U.S. 563, 570 (1989)).  And, as we explained above, those are distinct substantive offenses for which Casillas can be punished independently.

Bell, too, does not alter our decision.  349 U.S. 81. There, the petitioner pleaded guilty under the Mann Act for having transported two women for the purposes of prostitution.  The

- 20 -

provision of the Mann Act at issue stated that "[w]hoever knowingly transports in interstate or foreign commerce . . . any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose . . . [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both." Id. at 82(citing 18 U.S.C. § 2421). Because Bell "transported the two women on the same trip and in the same vehicle," he argued that "he committed only a single offense and could not be subjected to cumulative punishment under the two counts." Id. Holding that the Mann Act was ambiguous as to the unit of prosecution, the Supreme Court applied the rule of lenity, resolving the ambiguity in the defendant's favor and "against turning a single transaction into multiple offenses." Id. at 84. The Mann Act did not contain a definite article explicitly stating units of prosecution whereas the Animal Welfare Act does.

The rule of lenity applies only "where there is a 'grievous ambiguity' that cannot otherwise be resolved." United States v. Millette, 121 F.4th 946, 952 (1st Cir. 2024) (quoting United States v. Dion, 37 F.4th 31, 39 (1st Cir. 2022)). Because no such ambiguity exists here, "the rule of lenity has no application." Dion, 37 F.4th at 39. Having assured ourselves that Casillas's sentence does not frustrate double jeopardy principles, we move to the reasonableness of his sentence.

## B. Reasonableness

Typically, when faced with challenges to the reasonableness of a sentence, we bifurcate our review. United States v. Rosario, 143 F.4th 41, 45 (1st Cir. 2025) (quoting United States v. Ayala-Vazquez, 751 F.3d 1, 29 (1st Cir. 2014)). First, we assess the procedural reasonableness of the sentence, and then, we test its substantive reasonableness. Ayala-Vazquez, 751 F.3d at 29.

### 1. Procedural Reasonableness

"A sentence is procedurally sound so long as the district court did not commit a procedural error in arriving at the sentence." United States v. Nelson, 793 F.3d 202, 205 (1st Cir. 2015) (quoting United States v. Trinidad-Acosta, 773 F.3d 298, 308-09 (1st Cir. 2014)). Procedural errors may include:

> failing to calculate (or improperly calculating) the [GSR], treating the Guidelines as mandatory, failing to consider the section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the [GSR].

Id. (quoting Trinidad-Acosta, 773 F.3d at 308-09). "We review preserved procedural challenges for abuse of discretion, and in doing so, 'we review the District Court's factual findings for clear error and its legal conclusions de novo.'" United States v. Burgos, 133 F.4th 183, 189 (1st Cir. 2025) (quoting United States v. García-Pérez, 9 F.4th 48, 52 (1st Cir. 2021)). We, however,

review unpreserved arguments for plain error. United States v. Colcord, 90 F.4th 25, 30 (1st Cir. 2024).

Although the parties spar over whether Casillas preserved his challenge to the procedural reasonableness, we need not decide the issue because Casillas's challenges do not pass muster even with the benefit of our abuse-of-discretion review. We thus employ the abuse-of-discretion standard and move to the merits. And because all of Casillas's procedural-reasonableness arguments relate to the district court's explanation, we begin by outlining the district court's obligation to adequately explain the sentence before reaching Casillas's specific contentions.

A district court must "state in open court the reasons for its imposition of [a] particular sentence." 18 U.S.C. § 3553(c). This requirement "serves multiple purposes: it not only gives the defendant (and the public) an understanding of why the defendant is receiving a particular sentence, but it also 'allow[s] for meaningful appellate review' and 'promote[s] the perception of fair sentencing.'" United States v. Perez-Delgado, 99 F.4th 13, 21 (1st Cir. 2024) (alterations in original) (quoting Gall v. United States, 552 U.S. 38, 50 (2007)).

We have long recognized that "explaining the reasons for a particular sentence is more of an art than a science." Perez-Delgado, 99 F.4th at 21; see also United States v. Colón-Cordero, 91 F.4th 41, 50-51 (1st Cir. 2024) ("Just what kind

- 23 -

of explanation is needed depends on the context of each individual case."). So, when we review a sentence on appeal, we do not demand that the district court's explanations be "exhaustive" or "precise to the point of pedantry"; we simply ask whether the district court set forth "the primary factors underlying the sentence in a plausible and coherent manner." Burgos, 133 F.4th at 193 (quoting United States v. Rivera-Berríos, 968 F.3d 130, 134 (1st Cir. 2020)). Moreover, the rationales supporting the sentence "need not always be explicit." Perez-Delgado, 99 F.4th at 21-22 (quoting United States v. Flores-Nater, 62 F.4th 652, 656 (1st Cir. 2023)). Indeed, we may glean inferences from the sentencing record as long as "such inferences [are] anchored in 'what the judge did.'" United States v. Carrasquillo-Sánchez, 9 F.4th 56, 62 (1st Cir. 2021) (quoting United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc), abrogated on other grounds by Rita v. United States, 551 U.S. 338 (2007)).

When it comes to "brevity or length, conciseness or detail, when to write, what to say," that all "depends upon circumstances." Rita, 551 U.S. at 356. For instance, if the chosen sentence falls within the GSR, "a less elaborate explanation" typically suffices. Perez-Delgado, 99 F.4th at 21 (quoting United States v. Murphy-Cordero, 715 F.3d 398, 402 (1st Cir. 2013)). By contrast, "an outside-the-GSR sentence (whether above or below) requires more." Id. "Just how much more depends

on the degree of the variance. The more the sentencing court decides to vary, the more it needs to explain." Id.; see also Gall, 552 U.S. at 50 (stating that it is "uncontroversial that a major departure should be supported by a more significant justification than a minor one"); cf. Nelson, 793 F.3d at 206 (explaining the difference between a "departure" and "variance").

In any case, a district court that imposes a GSR-variant sentence must justify that variance by articulating why the defendant's "'case differ[s] from the norm,' or, in other words, 'the mine-run of [similar] cases.'" United States v. Serrano-Berríos, 38 F.4th 246, 250 (1st Cir. 2022) (first quoting United States v. Del Valle-Rodríguez, 761 F.3d 171, 177 (1st Cir. 2014); and then quoting Rivera-Berríos, 968 F.3d at 136); see also United States v. Mojica-Ramos, 103 F.4th 844, 851 (1st Cir. 2024) ("Where the offense involves 'idiosyncratic facts,' or 'especially heinous' conduct, a court may impose an upward variance to account for the fact that the guidelines' 'heartland' merely contemplates a typical or 'mine-run' case." (citations omitted)).

With those principles in mind, we turn to the district court's sentencing determination. Recall the rationale the district court set forth at the sentencing hearing. It started with Casillas's personal history and characteristics, before moving to an extensive discussion of Casillas's conduct. It then expressly invoked the section 3553(a) sentencing factors. Just

afterward, the district court mentioned section 2E3.1 and highlighted verbatim section 2E3.1's upward departure provision, Application Note 2. The district court said:

> Pursuant to [section] 2E3.1, Application Note 2, the base offense levels provided for animal fighting ventures is subsection (a)(1) and (a)(3) and reflect that an animal fighting venture involves one or more violent fights between animals and that a defeated animal is often severely injured in the fight, dies as a result of the fight, or is killed afterwards. Nonetheless, there may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense.
>
> In such a case, an upward departure may be warranted. For example, an upward departure may be warranted if the offense involved extraordinary cruelty to an animal beyond the violence inherent in such a venture. In this case, the number of fights and the duration of Mr. Casillas's involvement is extraordinary in nature.

Compare with U.S.S.G. § 2E3.1, app. n. 2.

The district court did not stop there, however. It next considered Casillas's question posed in his sentencing memorandum: "How much of a departure is sufficient but not greater than necessary to comply with the statutory directive set forth in Title 18 U.S.C. § 3553(a)?" And the district court answered that question by citing Casillas's extreme conduct and noting that "the guidelines d[id] not properly reflect the seriousness of the offenses committed by Mr. Casillas." In particular, the district court considered (1) "the number of fights and the duration of Mr. Casillas's involvement"; (2) Casillas's "fam[e]" and "celebrity" as "a legend in the dogfighting industry with over 35 years of

- 26 -

experience"; (3) his role in perpetuating dogfighting by, for instance, "mentoring newcomers and participating and maintaining fighting dog pedigree records"; and (4) the "deplorable conditions" of the dogs seized from Casillas's home. At one point, too, the district court expressed its disagreement with the guidelines, "[j]ust as a sentencing judge expressed in [United States v. Hargrove, 701 F.3d 156 (4th Cir. 2012)]." Finally, the district court reiterated that the sentence "[wa]s just and not greater than necessary after considering all of the sentencing factors."

Casillas says that that explanation wasn't enough. Although Casillas often minces concepts and arguments in his briefing, we distill the following four arguments (not made in this order): (1) the district court improperly departed from the relevant guideline; (2) it impermissibly relied on facts already accounted for in the relevant guideline; (3) it relied too heavily on general deterrence; and (4) it failed to adequately explain why it was deviating from the alleged guidelines regarding concurrent and consecutive sentences. We reject each contention.

**First**, Casillas challenges the district court's apparent upward departure. According to Casillas, the district court failed to adequately explain "why she varied" because she "does not explain why she declined to apply the vehicle provided for upward

departures . . . and jettison[ed] the Guidelines structure entirely." Casillas is misguided.

As a threshold matter, there is a distinction between a departure and a variance. See United States v. Fletcher, 56 F.4th 179, 187 (1st Cir. 2022) (acknowledging that "[w]e have observed that 'a departure is just a variance by another name,'" but explaining that the "difference between [the two terms] 'is hardly semantic'" (first quoting United States v. Santini-Santiago, 846 F.3d 487, 490 (1st Cir. 2017); and then quoting United States v. Miranda-Díaz, 942 F.3d 33, 40 (1st Cir. 2019))). "A 'departure,' as explained by the Supreme Court, 'is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines.'" Nelson, 793 F.3d at 206 (quoting United States v. Aponte-Vellón, 754 F.3d 89, 93 (1st Cir. 2014)). "Variant sentences, by contrast . . . result from a court's consideration of the statutory sentencing factors enumerated in [section] 3553(a)." Id. (quoting Aponte-Vellón, 754 F.3d at 93). That distinction matters because "[t]he procedural requirements for variances are more lenient than those for departures." Id. But we need not "inquire into the bona fides of the upward departure" when a district court makes clear that its sentence would also be fully supportable as an upward variance. United States v. Heindenstrom, 946 F.3d 57, 62 (1st Cir. 2019).

Such is the case here.  We need not address the validity of the district court's alleged upward departure because, as we explain herein, the district court made clear that the section 3553(a) factors fully supported an upwardly variant sentence.[9]  See Nelson, 793 F.3d at 207 ("[T]o the extent that there was any procedural error -- which we doubt -- it was harmless; the record makes clear that 'the district court would have imposed the same sentence as a variance in any event.'" (quoting Aponte-Vellón, 754 F.3d at 93)).  So, viewing the district court's analysis as an upward variance, we reject Casillas's departure-based argument and consider the remainder of his arguments through that lens.

---

[9] Casillas made no effort in his brief to distinguish between a departure and a variance; indeed, he often used the terms interchangeably.  Without any properly briefed arguments from Casillas, we see no issue in viewing the district court's analysis as primarily driven by the section 3553(a) factors.  We conclude as much given the district court's invocation of the 3553(a) factors during the sentencing hearing, and its statement of reasons afterward, which indicated that it imposed only an upwardly variant sentence under section 3553(a).  See United States v. Mendes, 107 F.4th 22, 32 (1st Cir. 2024) (holding that, "notwithstanding [a] district court's unfortunate use of the term 'depart,'" a "district court's intent to vary upward is evidenced by its explicit reference to section 3553(a)"); see also Nelson, 793 F.3d at 206-07 (similar).

What is more, even if we construed the district court as having employed only an upward departure, we discern no error in its analysis.  After all, Application Note 2 to section 2E3.1 provides for upward departures where the defendant's conduct involves extreme cruelty or animal fighting on an exceptional scale, and the district court pointed to those factors in fashioning the sentence.

**Second**, Casillas insists that the district court impermissibly relied mostly on facts common in the mine-run of these offenses. Although his argument is scattered throughout multiple, separately marked parts of his brief, we understand it as follows: Casillas believes that the explanation for the upwardly variant sentence was unreasonable because the district court relied on facts inherent in, or "already fully accounted for by[,] the applicable guidelines." Rivera-Berríos, 968 F.3d at 134.

We disagree. Casillas's argument depends on an unduly narrow reading of the guidelines. As mentioned earlier, Application Note 2 defines "extraordinary cruelty" as "killing [the animal] in a way that prolongs the suffering of the" animal. Casillas takes that example and suggests that extraordinary cruelty must mean something like "crude executions by electrocution, bludgeoning, [or] drowning." And so, he says, his practice of letting his dogs die in fights instead of trying to alleviate their suffering was not beyond the scope of conduct inherent in the guideline.

We do not see how Application Note 2's example of extraordinary cruelty limits the term's definition to only the intentional killing or torturing of animals. We likewise see no reason why the definition of extraordinary cruelty would exclude Casillas's conduct here. As with all upwardly variant sentences, we ask whether the government proved, and the district court

- 30 -

adequately explained, how the defendant's case differs from "the mine-run of similar cases." Serrano-Berríos, 38 F.4th at 250 (citation modified). And that happened here.

Recall that Casillas admitted in text messages that he did not "pick up" losing dogs, meaning he let them die instead of removing them from the fights. Beyond those texts, the government presented to the district court a video showing the result of Casillas's practice: as the district court noted, the video demonstrated Casillas's losing dog's prolonged suffering, its "breathing in agony," and its bleeding out with Casillas making no attempt to alleviate the dog's suffering. The government's expert -- with nearly a decade and over 60 dogfighting cases of experience -- called this practice "not very common at all." Given that evidence and testimony, and in the absence of countervailing evidence or testimony, the district court permissibly found that Casillas's conduct was extraordinarily cruel. Casillas has not shown us a reason to disturb the district court's conclusion.

Casillas's challenge falters for yet another reason: in focusing on how cruelty is inherent in the guidelines, Casillas made little effort to contest the district court's other findings that justified the upward variance, namely, his involvement in dogfighting on an exceptional scale. In fashioning the upwardly variant sentence, the district court relied on Casillas's

participation in 150 dogfights over 35 years, his role in perpetuating dogfighting, and his advertising dogfighting events of unprecedented size. Casillas does not meaningfully contend with those distinguishing factors. Instead, he constructs a straw man, arguing only that he was winding down his operations and that his having four dogs on his property indicates that his offenses did not involve an unusually large number of animals. We are unmoved. That Casillas was winding down does not change the fact that his involvement was extensive and spanned 35 years. Moreover, his contention that because he had only four dogs meant he was not engaging in dogfighting on an exceptional scale is belied by his own statement that he kept up to 40 dogs at a time.

In sum, the district court explained how the extraordinary cruelty and exceptional scale of Casillas's operation took this case outside the mine-run of similar offenses, and Casillas has not convinced us to disturb that decision.

**Third**, Casillas argues that "general deterrence was the driving force" and a "defining factor[]" of the district court's justification for imposing an upwardly variant sentence. Working from that premise, Casillas blames the government for its lack of enforcement of animal welfare laws, saying that it is not now reasonable for the government to weaponize its own "inaction . . . as a basis for extraordinary punishment" against Casillas. Casillas misses the mark.

"Generally, the weight attributed to each sentencing factor is largely within the district court's informed discretion." Burgos, 133 F.4th at 193. "[T]he relative weight of each factor will vary with the idiosyncratic circumstances of each case." United States v. Hassan-Saleh-Mohamad, 930 F.3d 1, 9 (1st Cir. 2019). We have cautioned that "[i]t is possible for a sentencing judge to focus too much on the community and too little on the individual and, thus, impose a sentence that cannot withstand the test of procedural reasonableness." United States v. Flores-Machicote, 706 F.3d 16, 24 (1st Cir. 2013). But we have held that "procedural error generally does not lie when a district court grounds an upwardly variant sentence in a well-reasoned mix of case-specific and community-based characteristics, distinguishing the defendant's particular circumstances from the ordinary offense covered by the guidelines." Burgos, 133 F.4th at 193.

Here, the district court did just that. As we noted above, the district court invoked various case-specific facts that made clear that Casillas's offenses were out of the ordinary. And "[o]ur review of the record does not reveal any 'compelling indication that the court gave undue weight to'" general deterrence. Id. at 194 (quoting United States v. Aponte-Colón, 104 F.4th 402, 419 (1st Cir. 2024)). Nor has Casillas "attempt[ed] to explain, in light of the district court's multifaceted

rationale, how we should discern the precise weight the district court accorded to" general deterrence.  Id.  Given that "a variant sentence may be 'based on a complex of factors whose interplay and precise weight cannot . . . be precisely described,'" we doubt we could accurately parse out the precise weight the district court ascribed to general deterrence such that we could find it to be the driving force behind the upward variance.  United States v. Matos-de-Jesús, 856 F.3d 174, 179 (1st Cir. 2017) (quoting United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008)).  Indeed, as far as we can tell from the record, general deterrence seemed to play little part in the sentencing court's overall decision: in passing sentence, the district court made only superficial references to deterrence interests, mentioning deterrence only alongside the other section 3553 sentencing factors.

**Fourth** and finally, Casillas argues that the district court sidestepped its obligation to explain why it was deviating from the guidelines and imposing a consecutive sentence.[10]  His

---

[10] Throughout his brief, Casillas spills much ink claiming that the district court failed to follow "grouping principles." As we see it, Casillas's "grievance" seems to be "with the court's decision to impose consecutive rather than concurrent sentences, apparently on the theory that grouping precludes consecutive sentences." United States v. García-Torres, 341 F.3d 61, 74 (1st Cir. 2003).  But, for one, "the district court did not fail to 'group'" the counts.  Id. at 73-74.  And, for another, we made clear in García-Torres that grouping counts is distinct from -- and "does not preclude" -- "the imposition of consecutive sentences on each of them." Id. at 75.  So this argument fails.

assertion relies on the language of guidelines section 5G1.2(d), which states:

> (d) If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

Casillas ostensibly suggests that "total punishment" means the GSR calculated in the PSR, which the district court deemed was accurately calculated. And so, Casillas's argument goes, the district court erred by failing to explain why it opted to impose consecutive sentences when the total punishment was allegedly 12 to 18 months.

Casillas's contention disregards our precedent. Even if the district court had an obligation to explain any departure from section 5G1.2(d), the district court did not deviate from the guideline. While it is true that "'[t]he total punishment' under U.S.S.G. § 5G1.2 is normally determined by the guideline range," (here, 12 to 18 months), that is only part of the picture. See United States v. Hernandez Coplin, 24 F.3d 312, 320 n.9 (1st Cir. 1994). Indeed, we have made pellucid that "where the sentencing court lawfully departs from the [GSR], 'the total punishment' is the punishment specified as a result of that departure; and sentences then run consecutively 'to the extent necessary to

provide a combined sentence equal to the total punishment.'" Id.

(emphasis added) (quoting U.S.S.G. § 5G1.2(d)). Simply put, the

"total punishment" here was the level at which the district court

set it after its upward variance from the guidelines, and so the

district court's decision to impose consecutive sentences to reach

that total punishment did not conflict with section 5G1.2(d).[11]

## 2. Substantive Reasonableness

Having disposed of Casillas's procedural-reasonableness

challenges, we turn to his claim that the sentence imposed was

substantively unreasonable. We review preserved challenges to the

substantive reasonableness of a sentence for abuse of discretion.

United States v. Santiago-Lozada, 75 F.4th 285, 293 (1st Cir.

2023). We keep in mind that "reasonableness is a protean concept":

"[t]here is no one reasonable sentence in any given case but,

rather, a universe of reasonable sentencing outcomes." Burgos,

133 F.4th at 195 (first quoting United States v. Merced-García, 24

F.4th 76, 81 (1st Cir. 2022); and then quoting United States v.

Polaco-Hance, 103 F.4th 95, 104 (1st Cir. 2024)). "Our task is

simply to determine whether the sentence falls within this broad

---

[11] In his reply brief, Casillas seemingly insists that the
district court had an obligation to precisely explain the offense
level to which it was upwardly varying. Yet, Casillas waived this
argument because he raised it for the first time in his reply
brief. See Navellier & Assocs., Inc., 108 F.4th at 35 n.9
("Arguments raised for the first time in reply briefs are generally
deemed waived." (quoting United States v. Evans-Garcia, 322 F.3d
110, 114 (1st Cir. 2003))).

universe, and we do so by looking for the hallmarks of a substantively reasonable sentence: a plausible sentencing rationale and a defensible result." Id. (citation modified). To prevail on his challenge, Casillas "must adduce fairly powerful mitigating reasons and persuade [us] that the district judge was unreasonable in balancing pros and cons." Rosario, 143 F.4th at 49 (quoting Ayala-Vazquez, 751 F.3d at 32-33).

Besides Casillas's general deterrence argument, which we construed as a challenge to the procedural reasonableness of the sentence, Casillas's only remaining argument to the substantive reasonableness of the sentence is that similarly situated defendants -- and defendants with worse offense conduct -- received better sentences than him.[12] We are not convinced.

Section 3553(a)(6) directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). It "is primarily concerned with

---

[12] We have treated disparity arguments as challenges to both the procedural and substantive reasonableness of the sentence. See, e.g., United States v. García-Sierra, 994 F.3d 17, 39-40 (1st Cir. 2021); United States v. Reyes-Santiago, 804 F.3d 453, 468 (1st Cir. 2015). Casillas couches the disparity argument in terms of substantive reasonableness, insisting that the sentence itself creates glaring disparities between him and similarly situated (or more culpable) defendants. So we consider it under the substantive reasonableness umbrella.

national . . . disparities." United States v. González-Rivera, 111 F.4th 150, 155 (1st Cir. 2024). "To establish a well-founded claim of sentencing disparity, a defendant must 'compare apples to apples.'" United States v. Coplin-Benjamin, 79 F.4th 36, 43 (1st Cir. 2023) (quoting United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015)). "Where 'material differences between the defendant and the proposed comparator suffice to explain the divergence,' a sentencing disparity claim is unlikely to prevail." Id. (quoting United States v. Demers, 842 F.3d 8, 15 (1st Cir. 2016)). The defendant bears the burden of "furnish[ing] the court with enough relevant information to permit a determination that he and his proposed comparators are similarly situated." González-Rivera, 111 F.4th at 155 (quoting United States v. Rodríguez-Adorno, 852 F.3d 168, 177 (1st Cir. 2017)).

On this record, we cannot conclude that the district court erred. For one thing, Casillas spent much of his time at the sentencing hearing highlighting some distinctions between his conduct and that of the defendants in the cases cited by the government in support of its position for an upward variance. Casillas's principal assertion was that some of the similarly (or, in some cases, more severely) punished defendants' crimes involved drugs, guns, or more seized dogs. That exercise, though perhaps helpful in convincing a district court to impose a lower sentence, was far afield from furnishing the court with sufficient

- 38 -

information to determine whether the proposed comparators were similarly situated and received comparatively lower sentences. See Rodríguez-Adorno, 852 F.3d at 177 (noting defendant's obligation to provide the court with relevant information and holding that "the appellant utterly failed to lay any foundation on which to build a claim of sentencing disparity").

In all events, Casillas's attempt to rehash more thoroughly his disparity argument on appeal fails on the merits too. Although some of the comparators Casillas points out were similarly situated in one, or even several, aspects, "material differences between [Casillas] and the proposed comparator[s] suffice to explain the divergence." United States v. Romero, 906 F.3d 196, 211 (1st Cir. 2018) (quoting Demers, 842 F.3d at 15) (second alteration in original). Plainly stated, Casillas did not present a single comparator who, standing alone, matched both the "extraordinary cruelty" and "exceptional scale" of his involvement in the dogfighting world. Remember, Casillas was a legend in the dogfighting world; engaged in dogfighting for 35 years; participated in 150 dogfights; raised and trained fighting dogs for sale on an unprecedented and international scale; hosted a dogfighting event of unprecedented size; mentored others to perpetuate dogfighting; and let his dogs die if they lost in a fight. See United States v. Bishoff, 58 F.4th 18, 26 (1st Cir. 2023) (explaining that "[m]aterial differences" include

"dissimilar criminal involvement" between the defendant and the comparator (quoting United States v. Candelario-Ramos, 45 F.4th 521, 526 (1st Cir. 2022))).

To be sure, Harry Hargrove's length of involvement and his conduct comes close: Hargrove engaged in dogfighting for 40 years, was also considered a "legend" in dogfighting circles, had up to 250 dogs at one time, had 36 dogs seized at the time of his arrest, and had jumper cables, which he presumably used to electrocute dogs. United States v. Hargrove, 701 F.3d 156, 158 (4th Cir. 2012). Hargrove received only a 60-month sentence. On its face, that disparity -- 24 months below Casillas's sentence -- seems inextricably disparate. United States v. Hargrove, No. 7:10-cr-00135 (E.D.N.C. Aug. 4, 2011), ECF No. 42 at 45-46. But again, a material distinction deprives the comparison of much value: Hargrove faced a conviction on only one count (Casillas faced three), and that one count carried a statutory maximum term of imprisonment of 60 months. Id. In other words, the district court in that case could not have imposed a higher sentence. And the court in Hargrove's case did, in fact, note that "if [Hargrove] had been indicted for other charges, he would be facing significantly more time." Id.

We need not belabor the point. The other dogfighting defendants that Casillas counts on as comparators were not

materially similar to him.[13]  See Rosario, 143 F.4th at 48 (explaining that "a sentencing disparity claim is unlikely to prevail" "if 'material differences between the defendant and the proposed comparator[s] suffice to explain the divergence'" (quoting Demers, 842 F.3d at 15)).  Nor do the sentences in those cases suggest to us that Casillas's sentence here is substantively unreasonable.  Casillas raises no other challenges to the substantive reasonableness of his sentence.  And, in any event, the district court provided a plausible sentencing rationale and the ultimate sentence was defensible given Casillas's decades-long involvement in this heinous conduct.  We accordingly discern no abuse of discretion.

### III. CONCLUSION

For all those reasons, we **affirm** the judgment of the district court.

---

[13] Casillas briefly invokes Puerto Rico's statistical data, claiming that it shows that all 38 criminal defendants with his same total offense level and criminal history category received a 16-month sentence on average.  But without more specific information, that sterile data set tells us nothing about the substantive reasonableness of Casillas's sentence.  See Flores-Machicote, 706 F.3d at 24 ("Statistical evidence that fails to satisfy minimum standards of reliability proves nothing.").